[No. 34671. *En Banc.* December 15, 1960.]

LOUIS PLANCICH, *Respondent*, v. HAROLD V. WILLIAMSON *et al., Appellants.*[1]

[1] Reported in 357 P. (2d) 693.

*Pebbles & Swanson, Brodie & Fristoe,* and *Rudolph Naccarato,* for appellants.

*Binns, Cunningham & Fletcher,* for respondent.

FINLEY, J.—This is an action for false imprisonment, assault and conversion of personal property growing out of an incident that occurred in the city of Olympia. The appellants, officers of the Olympia Police Department, were defendants in the trial court. It is undisputed that they arrested the respondent (plaintiff in the trial court) shortly after midnight; that this arrest was made without a warrant; that, subsequent to the arrest, the respondent was booked for investigation as to his sanity and was confined, first in the city jail for some thirteen hours, and then in the Thurston County Jail for an additional fifty-two hours; and that finally, after an examination by a doctor (who pronounced him "grossly sane"), the respondent was released from custody without any formal charges ever having been filed. It also appears to be uncontested that, at the time the respondent was booked, certain of his personal effects were taken from him and were not returned.

After a trial on the merits, the trial judge, sitting without a jury, dismissed the cause of action for assault because of

insufficient evidence, but upheld the respondent's charges of false imprisonment and conversion. Judgment was entered against the appellants in the total sum of $1,030.00. Of this amount, $1,000 related to the cause of action for false imprisonment; the remaining $30 concerned the conversion of personal property. Respondent has not cross-appealed from the dismissal of his cause of action for assault; neither have the appellants attacked so much of the judgment as relates to the conversion of the respondent's personalty. Thus, the only question on appeal is the correctness of the trial judge's disposition of the cause of action for false imprisonment.

█ The authority of a peace officer to make an arrest without a warrant, if he reasonably believes that the party committed a felony, originated in the common law; *State v. Hughlett* (1923), 124 Wash. 366, 214 Pac. 841, sustains the principle in this jurisdiction. On the other hand, where there is an abuse of the authority to arrest without a warrant, the law provides that a citizen may sue and collect compensatory damages from the offending law enforcement officers.

The authority to restrain a dangerously insane person also appears to have existed at common law (see *In re Allen* (1909), 82 Vt. 365, 73 Atl. 1078), and the subject is now expressly covered by statute in this state.

█ Chapter 139, § 18, p. 347, Laws of 1951 (*cf.* RCW 71.02.120), effective when the alleged false arrest and imprisonment occurred, provided, in part, as follows:

" . . . In emergencies requiring immediate apprehension and restraint, or at times when superior courts are not open for business, any sheriff or other peace officer, may, when he *shall have reasonable cause to believe any person is so mentally ill as to be unsafe to be at large,* apprehend such person without warrant, wherever found, . . . ." (Italics ours.)

As an affirmative defense to the respondent's lawsuit for damages for false imprisonment, the appellants urged in the trial court and reiterated here on appeal that, at the time of the arrest and confinement, they had reasonable

cause to believe that (a) the respondent had committed a felony, and (b) the respondent was "so mentally ill as to be unsafe to be at large." Clearly, if either of these claims is correct, the arrest and the confinement (although without a warrant) were not unlawful, and any harm suffered by the respondent as a result thereof is not compensable. *Coles v. McNamara* (1924), 131 Wash. 377, 230 Pac. 430.

■ Appellants' principal assignments of error concern the refusal of the trial judge to enter proposed findings of fact which might better have been denominated *conclusions of law*. These were to the effect that, at the time of the apprehension and arrest of the respondent, the appellants had reasonable grounds to believe (a) that the respondent had attempted to commit a felonious assault upon the person of his father, Jerry Plancich, and (b) that the respondent was so mentally unsound as to be dangerous if left at large. The proposed findings, or conclusions of law, were predicated upon testimony given by the appellants, and by certain other police officers who were, incidentally, involved in the apprehension and arrest, but are not parties to this appeal. The trial judge, as trier of the facts, was entitled to disbelieve this testimony in entirety. See *Dundon v. Dundon* (1910), 83 Conn. 716, 76 Atl. 1008, where the supreme court of errors of Connecticut held that a trial court's refusal to find a fact will not be disturbed on appeal, even though the defendant's testimony on which a finding was requested was not directly contradicted.

In the instant case it is clear that the trial judge did not *entirely disbelieve* the appellant's testimony. According to that testimony, at about 10:30 p. m., on the night of October 17, 1954, the acting desk sergeant at the Olympia police station was confronted by Jerry Plancich, a man of about seventy-eight or seventy-nine years of age. When asked at the trial to relate what then transpired, the acting desk sergeant replied:

"Mr. Plancich stated to me that his son came and knocked on the door [of the father's bedroom] and threatened to kill him. He said that he had two guns, one was a small one and one was a big one and he was at that time very

nervous and speaking broken English and it was kind of hard for me to ascertain what he was saying. So I had him repeat it several times and I drew the conclusion that he had been threatened in his own home and he said that he got dressed, went out through a window and came to the police for help."

Appellants Handspiker and Schuler were sent with Mr. Plancich to the Plancich home. When they arrived there, the officers found the house almost completely dark. They got no response when they knocked on the door. Looking through a window into the house (which was illuminated only by light from a single candle), they saw Louis Plancich sitting in the kitchen; he was staring straight ahead. He had a heavy growth of beard. His hair was disheveled. Because Louis gave no response to their knocking and calling to him, officers Handspiker and Schuler requested that additional policemen be sent to the premises. One of the new arrivals was appellant Williamson, Assistant Chief of Police, who took charge of the operations. A detachment from the fire department also arrived.

Repeated demands did not induce Louis to cooperate. Instead, he silently left the kitchen, went into his bedroom, and bolted the door behind him. The policemen decided to enter the house. Since the front door was bolted, they were forced to gain entry through Jerry Plancich's bedroom window. The bedroom door, which had been locked (as Jerry Plancich, the elderly father, had asserted), was opened with the key previously given to the officers by Jerry. Thereupon, the officers ordered Louis to throw down any guns he had and to open his bedoom door or it would be broken open. Louis answered that he had no gun (this was the first he had spoken to the police); but he did not open the door. The police broke the panel out of the door and reached inside to dislodge the bolt. A second bolt remained in place. Louis went to the door and released it. The police entered the room, seized Louis (who had an "awful wild stare in his eye"), threw him to the floor (injuring his wrist), and handcuffed him. Louis was then under arrest.

The trial judge could have disbelieved and disregarded the foregoing line of testimony in its entirety; actually, however, he entered the following confirmatory finding:

"Thereupon at about 11 P.M. on said date all the Defendants, acting in their respective capacities as police officers surrounded said house at 1971 Pacific Avenue, Olympia, Washington. Defendant Williamson was in command of all the police officers there assembled. Defendants demanded that plaintiff come forth and surrender to them and threatened to use tear gas if he did not do so. Plaintiff made no resistance but did not come forth or surrender but stayed in his locked bedroom."

The trial judge further found:

"After about three hours of siege, shortly after 1:00 A.M. on October 18, 1954, Defendants Handspiker and Schuler, under the direction of Defendant Williamson, broke through Plaintiff's locked bedroom door, and forcibly arrested Plaintiff."

In summary, the trial judge apparently did believe that the appellants went to the Plancich home in response to the elder Plancich's complaint that the respondent had threatened to kill him with a gun; and that, upon arrival at the scene, they discovered that the respondent had locked himself within the house, made no response to the officers' attempts to communicate with him, and refused their repeated demands that he should come out. We think the indicated actions of Louis Plancich in the setting involved were, to say the least, considerably on the odd side. Also, more likely than not, his actions would have been so regarded at the time and place by reasonably prudent individuals, not fully aware of his particular proclivities. The number of police officers, the firemen, the equipment involved, the scale and duration of the police maneuvers are in one sense somewhat revealing. In fact, it seems obvious and significant to us, from the findings actually made by the trial judge, that the police officers were apprehensive and proceeded slowly and with extreme caution in the operations at the Plancich menage.

The trial judge refused to enter a finding proposed by appellants relating to their testimony that respondent, at

the time of his arrest, was highly distraught. Apparently, the judge disbelieved this particular testimony. But the question we must answer is whether, on the basis of the testimony actually believed by the trial judge, it was error for him *to conclude* that, at the time of the arrest, the appellants did not have reasonable cause to believe either (1) that the respondent had threatened his father with a felonious assault, or (2) that the respondent was mentally unsound and dangerous to be at large.

In resolving the question as to probable cause, we must view the facts in retrospect—as of the time the incidents occurred leading up to and including the arrest. The questions are not: (1) What, actually, in fact had the respondent done on the evening in question respecting his father? or, (2) What, actually, in fact was the respondent's mental condition at the time of arrest? Rather, the questions are: (a) What did the appellants have reason to believe the respondent had done? and, (b) What did they have reason to believe as to his mental condition?

█ The test as to reasonable grounds for making an arrest for a felony without a warrant was described by the court in *State v. Hughlett, supra*, as follows:

" . . . Proper cause for arrest has often been defined to be a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty. . . . "

The reasoning inherent in the foregoing statement seems equally applicable in the case of apprehension of a person purportedly "so mentally ill as to be unsafe to be at large."

It is of course a fundamental policy of our system of law and order—founded in constitutional precept, supported by legislation and documented chapter and verse by judicial decision—that citizens should be secure in their persons and in their homes against *overzealous* action and *capricious* conduct of law enforcement officers. Most certainly, Gestapo-like, or police state techniques, should be beyond the pale. In this connection, it should not be necessary to dwell on what might happen to the aforementioned fundamentals,

generally, if eccentricity became a ground to arrest and detain a person, without due process of law.

On the other hand, it can be said that "A policeman's lot is not a happy one."[2] Frequently, he is damned if he does, and damned if he doesn't. While it may be expected that policemen act as supermen, they are not employed and often are not trained or paid on this basis. Furthermore, they live, work, and operate in a practical world, peopled by individuals of all kinds and varieties, intellectually, emotionally, and otherwise. It is simply too much to expect them to be endowed with clairvoyant powers or the wisdom of philsophers sufficiently to evaluate promptly on the firing line in terms of absolute truth and accuracy factual situations comparable to that in the instant case. Analysis in retrospect, with time for philosophic deliberation, can, of course, more closely approximate the accuracy or ultimate truth of laboratory or other scientific techniques.

We do not imply that Jerry Plancich's statement to the acting desk sergeant should have been taken fully and completely at face value. However, we believe that a reasonable person in the position of the desk sergeant would have been remiss had he not responded as the desk sergeant did in dispatching policemen to investigate the complaint. Had Louis Plancich answered the policemen who called to him from outside the house, had he informed them of facts that were later brought out at the trial (that his father, Jerry Plancich, was emotionally upset because of his wife's death the year before; that he had nightmares and imagined that the dead would come back to haunt him; that he was excitable and senile), it would perhaps have seemed unreasonable for the officers to have given substantial credibility to the father's charge that his son had made a felonious assault upon him. But Louis Plancich did not react this way. In view of Jerry's allegations and the unusual behaviour and appearance of Louis, the policemen could not reasonably be expected to turn their backs on the situation. Certainly nothing occurred prior to the time the

[2]Gilbert and Sullivan: *Pirates of Penzance.*

arrest was in fact consummated by the officers to seriously discredit Jerry's story. Once again, it seems most convincing to us from the number of police officers, the firemen and equipment involved, and the size and duration of the operations, that there was considerable apprehension at the time, and that the police did not proceed precipitously and capriciously, but with extreme caution and reasonable propriety. In a context of lethal weapons, threats of bodily harm, and disturbed if not distraught human emotions—where reasonable angels would fear to tread—can we expect policemen to be stout-hearted fools, irrevocably bound to an inane but impeccable standard of charm-school manners?

■ A case of arrest without a warrant necessitates striking a balance as to (a) considerations respecting the rights of the individual citizen taken into custody, and (b) considerations respecting the responsibility of police officers for the safety and security of all members of the community; i.e., the propriety of law enforcement or police action. It is a problem of value judgment. The test, purely and simply, is one of reasonableness, considering the time, the place, and the pertinent circumstances.

Viewed in calm perspective, and from the vantage of retrospect, we can see that the unfortunate occurrence, which eventually turned out to be no more than a tempest in a teapot, could and probably should have been handled differently.

■ Some three hours elapsed from the time of the father's complaint until Louis was arrested. During this interval one of the several policemen who were milling around the house could have been sent to secure a warrant. Perhaps with the police manpower available, the Plancich home could merely have been kept under surveillance until the following morning. Other courses of action possibly may be conjectured. However, the question we must answer is not what could better have been done, but whether what was done was unreasonable. The potential threat to the peace, safety and security of the community occasioned by a gun-wielding, emotionally distraught individual

citizen is a critical one. In the discharge of their responsibilities for protecting the peace and safety of the community and for protecting Louis from himself, the police could not be absolutely certain until Louis was physically placed in custody. But absolute certainty cannot be the test for initiating police, law-enforcement action and, logically, should not be the test for determining the lawfulness of an arrest. Short of certainty, the police are required to exercise reasonable judgment and discretion. In the instant case it may well be that no one factor by itself would have been sufficient to justify the conduct of the police officers. The cumulative effect of all the circumstances, however, necessarily leads us, as it led the policemen, to the conclusion that probable cause existed for the arrest, either on the ground that a felony had been perpetrated or the individual involved was not safe to be at large.

We arrive at this result convinced that the trial judge ascertained the physical or other facts accurately; but that he nevertheless erred in evaluating the facts and in the inferences or conclusions he deduced from the facts. In other words, the trial judge erred in the value judgment implicit in his conclusion of law that the appellants had no reasonable cause for arresting or taking the respondent into custody.

It should be mentioned that in the afternoon, at about two o'clock p. m., following his arrest, respondent was transferred to the Thurston County Jail where he was held for two days and then released. If, contrary to the conclusion we have reached, the arrest had been wrongful, perhaps the arresting officers would be liable for all damages suffered by the lengthy duration of imprisonment. 4 Am. Jur., Arrest, § 121. However, as we have already stated, we think the arrest was made on reasonable grounds. Liability cannot attach solely because of the obviously, unduly long detention. There must be some basis for placing the responsibility for the long detention, at least to some degree, on the appellant officers. The only finding by the trial court in this respect was that "plaintiff was deprived of his liberty by reason of his arrest by defendants for a period of

three days without due process of law. . . ." This finding or conclusion does not place clearly on the appellants any responsibility for the period Louis actually was confined and in the custody of the county authorities. So far as the findings and the record show, appellants' responsibility with regard to respondent's arrest terminated when he was turned over to the county authorities for a mental examination.

The judgment of the trial court relative to the respondent's claim of false imprisonment growing out of an unlawful arrest should be reversed. As the appellants are the prevailing parties respecting the only issue presented by this appeal, they are entitled to their costs. It is so ordered.

MALLERY, HILL, OTT, and HUNTER, JJ., concur.

FOSTER, J., did not hear argument or participate in the decision herein.

MALLERY, J. (concurring)—The alleged false arrest in this case had this factual background:

An old man came to the police station at 10:30 p. m. and told the police that his son had two guns, a big one and a little one; had knocked on his door and threatened to kill him; and that he had slipped out a window and had come to the police station. This was a statement of the commission of a felony. The police believed him and acted in their official capacity and in good faith.

The dissent questions the right of the police to believe and act upon such an unsworn statement, and suggests that the old man should have been required to go before a magistrate and procure a warrant. Such a requirement would subject law enforcement procedures to *the law's delays* incident to *court procedures*. It would mean the end of effective police protection for law-abiding citizens. It is not practical to call a judge to make an appointment for a hearing when a burglar is in the house.

The question of credibility prior to arrest should not be allowed to dominate and impair law enforcement. It is

true the boy who cried "wolf" had an impaired credibility, but the refusal of police protection on that account exacted too high a price for such a fault.

A policeman's performance of duty would become a mere gesture if he were made personally liable for being deceived, or if the reasonableness of his acts were to be judged on the basis of post-arrest investigations.

ROSELLINI, J. (dissenting)—The majority find, contrary to the finding of the trial court, that the arrest of Louis Plancich was made with reasonable grounds to believe that he was about to commit a felony, or that he was mentally unsound and dangerous to be at large. They do not decide which of these beliefs the defendants were reasonably justified in entertaining.

At the outset it is well to have in mind some of the fundamental rules of law applicable in testing whether the trial court erred in holding that there was not a probable cause for the arrest of the plaintiff.

The supreme court in reviewing the sufficiency of the evidence to sustain the judgment must consider the evidence alone most favorable to the successful party. *Aurelio v. Puget Sound Electric R.*, 80 Wash. 480, 141 Pac. 1030.

Upon review of a judgment based on findings, respondent is entitled to the benefit of all the evidence and reasonable inference therefrom in support of the judgment.

The reviewing court will consider only the evidence most favorable to the respondent and will eliminate from consideration all evidence contrary thereto or in conflict therewith. *Shultes v. Halpin,* 33 Wn. (2d) 294, 205 P. (2d) 1201.

Appellate courts cannot pass on the veracity of witnesses. *Anderson v. Kurrell,* 28 Wn. (2d) 227, 182 P. (2d) 1.

The trial court's view expressed in an oral opinion carries much weight and is entitled to careful consideration. *Brotherton v. Day & Night Fuel Co.,* 192 Wash. 362, 73 P. (2d) 788.

Louis Plancich, a young man something over thirty years of age, was on October 17, 1954, living with his father,

Jerry, aged seventy-eight or seventy-nine, in the family home at 1971 Pacific Avenue, Olympia. Louis was executor of his mother's estate, which included the home in question. The father had a community interest. The mother's half was devised to Louis.

Louis was somewhat odd and eccentric in manner and habits, but entirely harmless and peaceable. He had lived in Olympia practically all his life, and was graduated from high school there. He was clean in his habits.

Jerry Plancich was at the time in question emotionally upset because of his wife's death the year before. He was subject to nightmares. He had a habit of wandering from home, and had been brought home from Seattle and Tacoma after having wandered away. He imagined that the dead would come back and haunt him. He believed that his dead wife visited him. He was excitable. Had the officers chosen to investigate Jerry Plancich's complaint, these facts would have been revealed.

On the date mentioned, according to the police officers, the father appeared at the Olympia police station and told the acting desk sergeant that his son had knocked on the door and threatened to shoot him. The officer said "he was at that time very nervous and speaking broken English and it was kind of hard for me to ascertain what he was saying." There is nothing in this officer's statement or in the testimony of any of the other officers to indicate that the old man ever stated or suggested that he had seen a gun or other weapon. Officer Schuler candidly said that in his mind there was a mere possibility that Louis was armed and that he had no firm conviction that he was. No weapon was ever found. There is no evidence in the record, save hearsay, that such a threat was made. Louis testified that he had never had a gun in his life and that there was no quarrel nor other reason for the father's leaving the house on the evening in question.

While several other officers talked with Jerry Plancich, no investigation was made except to look at the City Directory. Eight police officers thereupon congregated at the Plancich home. The eight officers reached the house a few

minutes after eleven p. m. A second call came at 11:45. The fire department was called at 12:07 to assist in the siege. The plaintiff was brought to the police station at 1:45 a. m. At no time did he resist physically or do anything which could be called "violent."

The officers entered the house through a window. They kicked in Louis' bedroom door. They threw him on the floor to handcuff him; in so doing, they sprained his wrist. The officers realized as soon as the arrest was made that no assault nor felony had been committed and that no gun was involved; nevertheless they took him to the police station.

Louis was held in the city jail from 1:45 a. m., on Monday, until two p. m. the same day. He was then taken in handcuffs through the streets of Olympia to the county jail, where he was kept until six p. m. the following Wednesday, when he was released after a doctor who examined him pronounced him "grossly sane."

While in the city jail he demanded the right to communicate with his family and to call an attorney, but was refused.[3] His sister Mrs. Murphy was unable to communicate with him, though she tried. His sister Mrs. Gaetz was likewise refused permission to communicate with him. Mrs. Murphy was denied the right to talk with him at the county jail Monday evening and Tuesday morning. She finally was permitted to see him Tuesday afternoon. Louis was allowed no communication with the outside world until Tuesday.

No complaint was ever filed. No warrant was ever issued. He was never taken before a magistrate. The arrest was the subject of widespread and lurid newspaper publicity.

---

[3]This was clearly in violation of RCW 9.33.020 (5) which provides: "No officer or person having the custody and control of the body or liberty of any person under arrest, shall refuse permission to such arrested person to communicate with his friends or with an attorney, nor subject any person under arrest to any form of personal violence, intimidation, indignity or threats for the purpose of extorting from such person incriminating statements or a confession. Any person violating the provisions of this section shall be guilty of a misdemeanor. [1909 c 249 § 359 . . .]"

The trial court in its oral opinion stated:

"The difficulty in this case arose first when an old man wandered into the police station and made a complaint to an officer, who for one night was enjoying the glory of being an acting sergeant and that officer is not a defendant here. Why, the Court does not know, but certainly he started a chain of unfortunate events by using bad judgment at the outset. The old man's complaint very clearly showed that this was a family fight. During the pre-trial conference on this case, I think there was eight attorneys taking part in that, all very capable and learned attorneys, and there certainly was no agreement between them as to who the owner of that property was, as to who had the right of possession to it and it does involve some interesting and difficult legal problems.

"Louis Plancich was the executor. He also was the heir under his mother's will. He ultimately did receive a half interest in the property. Jerry Plancich owned a community interest in the property before the death of Mrs. Plancich and still owned it afterwards. Now, it is true that very possibly Jerry Plancich could have claimed a homestead upon the property, but he didn't do so and, anyway, things will be in a sorry state in this country when the day comes that people can call the police and by the use of authority and violence in the night time can substitute for the orderly, lawful procedure of declaring a probate homestead. The law provides means of getting people out of property where they are in possession wrongfully. . . .

"Also, this was a complaint by a man who, by the testimony, talked very broken English, a man who was very excited and, according to all the testimony, was somewhat senile and obviously not one who should be given the highest credibility. . . ."

I do not think it can be said that there were, at the time of the arrest, any grounds to believe that the plaintiff was about to commit an assault other than the unsworn and uncorroborated statement of his father that he had threatened to shoot him. The plaintiff was found to be unarmed, and there was no evidence that he said or did anything threatening in the presence of the officers. He simply remained peaceably in his home and refused to come out. Certainly there was no indication given during the three-

hour siege that the plaintiff was on the verge of committing a felony. I think the trial judge rightly so concluded.

So far as evidence of dangerous insanity is concerned, I can find none. No doubt the plaintiff showed signs of eccentricity. Instead of sitting in the glare of an electric light, he chose to light his room with a single candle. Instead of watching television, reading the comics, playing solitaire, or quietly getting drunk, he sat staring into space. To be lost in thought is an obvious sign of eccentricity, bordering on insanity perhaps, but hardly dangerous so long as thoughts do not give rise to actions. Rather than argue with those who besieged his castle and addressed him with abusive language, the plaintiff chose to ignore them. Peculiar, no doubt, but upon whom could he call to defend him against this attack? The police? As a further manifestation of his desire to be left alone, he barricaded himself against their final attack. When they broke down the barricade, he refused to resist arrest. His room was dirty and his clothes were shabby. Obviously, the man was eccentric, but I do not see in these facts any evidence that he was dangerous to be at large.

While not wishing to create any suspicion that I lack respect for electricity, entertainment, volubility, and cleanliness, I cannot subscribe to the theory that a manifestation of disdain toward them is sufficient ground for arrest. Nor do I think that an unsworn and uncorroborated report that an eccentric has threatened harm to a complainant can justify the invasion of the privacy of his home and his arrest therein without a warrant.

I do not see in the facts of this case any emergency requiring immediate action. The plaintiff's father was under no compulsion to return to the home that night; and a warrant could have been obtained the following day if he showed the court probable cause therefor. Condoning a police assault of this type upon a citizen in his home, to my mind, opens the door to far greater evils than it can conceivably prevent.

I would affirm.

WEAVER, C. J., and DONWORTH, J., concur with ROSELLINI, J.

March 9, 1961. Petition for rehearing denied.

