230 So.2d 825

STATE of Louisiana

v.

Frank JOHNSON.

No. 49861.

Jan. 20, 1970.

Richard A. Buckley, New Orleans, for appellant.

Jack P. F. Gremillion, Atty. Gen., William ·P. Schuler, Asst. Atty. Gen., Jim Garrison,·Dist. Atty., Louise Korns, Asst. Dist. Atty.,·for appellee. ·

HAMLIN, Justice:

Defendant was charged by bill of information with the crime of armed robbery. He was tried by a jury of twelve, convicted (the verdict was nine to three), and sentenced to serve thirty-five years at hard labor in the Louisiana State Penitentiary. He appeals to this Court from his conviction and sentence and presents for our consideration two specification of errors, which recite:

1. The arrest of appellant was illegal, and the ensuing line-up identification while appellant was still illegally detained should have been suppressed and excluded from evidence.

2. The verdict of guilty in which only nine out of twelve jurors concurred denied appellant due process and equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution. .

Twenty-five bills of exceptions were reserved in this matter. However, before argument in this Court, counsel for the defendant stated that all bills taken at trial were without merit. Therefore, contrary to our usual format in writing a criminal case, herein infra we shall only consider the specification of errors urged supra.

. The testimony taken on the hearing of the motion to suppress and on trial discloses in substance the following account of defendant's arrest, booking, line-up, the inci-

dents of the crime charged, and the actions of the victim following his being robbed by an armed man:

On December 26, 1967, at approximately 3:30 P.M., (the weather was clear and the sun was shining) Eugene Frischertz, a route salesman for Coca Cola Bottling Company, had just made a delivery at Brown's Grocery, 2139 Third Street, New Orleans, Louisiana, when a man, whom he saw from the mirror of his truck (there was a mirror on the right side and on the left side of the front of the truck), approached the door of the truck, brandished a revolver at him and demanded that he give him all of his money.[1] Frischertz gave the robber between $500.00 and $600.00 of money belonging to Coca Cola Bottling Company and $31.00 of his own money, and the robber fled. Frischertz reentered the grocery store and summoned the police; they arrived within approximately fifteen minutes, and Frischertz related the details of the robbery and gave them a complete description of the robber—weight, hair and clothing. Later, Frischertz went to the Detective Bureau where he was shown mug shots of suspects; he did not identify any of the pictures as being that of the defendant, but he pointed out characteristics—build and facial make-up—of the robber similar to those of the parties appearing in the mug shots. Thereafter, at a line-up, which we shall discuss infra, he identified the defendant as the man who had robbed him.

The robbery of truck drivers was prevalent in the City of New Orleans at the time Frischertz was forcibly robbed. The police were conducting an investigation for the purpose of arrest, and Lieutenant Theodore Feld, New Orleans Police Department, Detective Bureau, Robbery Division, was in charge. On the hearing of the motion to suppress, Lt. Feld testified:

"A. On the 18th of January we received information from a confidential informant—I didn't receive it—my superior, Captain Newman received it from one of his informants that Frank Johnson and Hayes, Harold Hayes—[Colloquy]

"A. Saying that these two subjects were involved in an armed robbery of truck drivers. So I sent one of the men over to the B of I to get photographs on subjects by the name of Harold Hayes and Frank Johnson in a group and have one of the men bring it to one of the victims who was employed by the Brown's Velvet. The man looked at the pictures and identified Frank Johnson and also a photograph of Harold Hayes. He initialed the same with the date and then that gave us

---

1. Frischertz was seated on the right side of the truck by the door; he was ac-

companied by two helpers, one of whom drove the truck.

probable cause to arrest him. The man positively said that was the man that held him up."

Marion Catalano, an employee of Brown's Velvet Ice Cream Inc., had been the victim of about three armed robberies; he identified defendant's photograph as that of a man who had committed a robbery on him. At Lt. Feld's instruction, Detective John Lanza secured the photograph identification. This was done shortly after Captain Newman, Assistant Chief of the Detective Bureau, communicated to Lt. Feld the information given to him by an informant, January 18, 1968.

On January 20, 1968, at approximately 6:00 A.M., Lt. Feld and Sgt. Lawrence John Vigurie arrested the defendant at his residence, 2135 Philip Street, New Orleans, Louisiana, for the robbery of Brown's Velvet Ice Cream, Inc. truck driver Catalano, but at the time of arrest Lt. Feld was not specific with the defendant; six officers were involved in the arrest. Lt. Feld testified that he knocked on Johnson's front door and was admitted by Mrs. Johnson and a male other than Johnson; that they were shown the officers' identification and told that the officers were looking for Frank Johnson. Defendant was taken from under his bed by Sgt. Vigurie, who told him that he was being placed under arrest for armed robbery; he was allowed to get dressed and was then handcuffed. Lt. Feld did not have an arrest warrant, but he testified that there was no reason for not securing one.

A search was made of the defendant's house, but we are not herein concerned with any fruits of the search. The issue of search and seizure connected with an arrest is not an issue herein involved.

Defendant was brought to the Detective Bureau at approximately 6:45 A.M., where he was apprised of his constitutional rights [2] and then interrogated. A short time later he accompanied and assisted the officers in the arrest of a suspect. He was returned to the Detective Bureau about mid-morning and then booked with a number of armed

2. On hearing of the motion to suppress, defendant testified:
"Q. Did they then come in to ask you if you wanted to make any statements?
"A. Yes, sir. About twenty, twenty-five minutes later they came into me and they read off of a piece of paper something to the fact pertaining to the fact that they advised me of my rights, and I told them I didn't want to make any statements; I didn't have anything to say.
"Q. Did you sign such a piece of paper, an arrestee form or anything like that?

"A. Yes, I signed the form that they had, notified me of my rights as an arrestee."
The records contain a form, *Right of an Arrestee or Suspect*, January 20, 1968, 7:10 A.M.; it is, signed by Det. John J. Lanza, and the statement is made that Sgt. Larry Vigurie was present. The form contains a check mark by the notation, *Refused to Sign*; this notation appears under the signature of the arrestee or suspect, which in this case is blank.

robberies.[3] Lt. Feld testified, "Catalano was the original booker and that is what we went out there to arrest him on."

A line-up was held at the Detective Bureau on January 23, 1968, and victims of all truck driver holdups in the location herein involved were requested to attend. Eugene Frischertz, the instant victim, was present and, as stated supra, identified defendant as the man who had robbed him on December 26, 1967. The testimony of Frischertz is in part as follows:

"Q. Now, let's get to the line-up, Mr. Frischertz: What happened at the line-up, tell us about it in your own words?

"A. I identified this man as being the man that held me up.

"Q. Did you identify him by a number?

"A. No.

"Q. If I showed you a picture, would it refresh your recollection: Is that the line-up?

"A. Yes, sir.

"Q. Were there a number at that date?

"A. There were.

"Q. I ask you if: Did you identify them by number?

"A. I did not. I identified him, then picked the number.

"Q. But you did identify by number?

"A. Not by number. I identified his face.

"Q. And then tied a number in with it?

"A. Right.

"Q. But there was always a number around his neck, correct?

"A. Right.

"Q. And that number was four?

"A. Right.

"Q. And did you identify him as to position in the line-up?

"A. No.

"Q. Do you know how many persons were in the line-up: I just showed it to you?

"A. Seven.

"Q. Who was the middle man?

"A. The middle man?

"Q. Yes. Number four—three on one side and three on the other—who was the middle man?

[Colloquy, and objection sustained.]

" * * *

3. On hearing of the motion to suppress, defendant testified: "Yes, sir; about four and a half, about five hours later on that evening they came back. They came upstairs and brought us back downstairs and they rebooked us with another armed robbery, and about fifteen minutes, later, maybe ten, they rebooked us with another armed robbery."

"Q. When you saw him, you immediately recognized him, is that correct?

"A. I did.

"Q. No officer was sitting beside of you prompting you?

"A. No.

"Q. No one had made any suggestions to you at the Detective Bureau?

"A. No."

Rene Belsom, a patrolman employed in the Bureau of Identification, having as one of his primary duties the taking of photographs, testified that he took a line-up picture on January 23, 1968. He identified S–1 offered in evidence as the picture he had taken; it is a line-up pose of seven men with defendant appearing as No. Four.

Byron Legendre, an attorney connected with Legal Aid, was present at the line-up of January 23, 1968. He testified:

"I went over to the Federal Lockup [Orleans] and interviewed a number of people who were booked at that time with the crime of armed robbery. I interviewed them on this premise: Whether or not they had a counsel or a lawyer of their own at that time and for those who said they did not, I told them that I would be available as their attorney for the purpose of the line-up alone to make sure that they got a fair line-up, and Number Two, to be able to report to their attorneys at

a later date as to what transpired at that line-up. And to each of these men I gave my card if I had one available and to each of them I promised I would let them know the results of the line-up after it was finished. Mr. Johnson was one of these men who said he did not have counsel."

Mr. Legendre further stated:

"These people are instructed by me, the suspects, are instructed by me to make a choice of the number they wish: They can stand next to whom they please. And the numbers are so chosen and then the rest of the people are handed out the numbers. Only the suspects get a choice of what number they want: They don't get a choice of who they stand next to. Once they have their numbers and the other numbers are given out, they are placed against the wall and then I have an opportunity to let the police know my appreciation of what I see."

Lt. Feld testified that Mr. Legendre represented the defendant at the line-up. On the hearing of the motion to suppress, defendant himself testified that he went to a line-up on January 23, 1968. He said that he had an attorney—he thought that he was Mr. Legendre from Legal Aid. He stated that the attorney represented him at the line-up and talked with him before same was held, advising him of his rights.

On February 14, 1968, a bill of information was filed against the defendant. He was charged with a violation of LSA–R.S. 14:64, in that "while armed with a dangerous weapon, to wit: a pistol, robbed one EUGENE FRISCHERTZ of Six Hundred and Thirty-One ($631.00) Dollars in United States Currency, * * *"

## SPECIFICATION OF ERRORS NO. 1

In this Court, counsel for the defendant urge:

A. The arrest was illegal because the arresting officer did not himself have the probable cause required of warrantless searches under the Louisiana and United States Constitutions.

B. The arrest of appellant was illegal because the arresting officer intentionally declined to obtain a warrant so that he could search "incidental" to the arrest.

C. The identification of appellant at a line-up after his illegal arrest, and while still illegally detained should have been suppressed and all evidence pertaining to it excluded at trial.

In Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) the United States Supreme Court said:

"* * * It is basic that an arrest with or without a warrant must stand upon firmer ground than mere suspicion, see Henry v. United States, 361 U.S. 98, 101, 80 S.Ct. 168, 170, 4 L.Ed.2d 134, though the arresting officer need not have in hand evidence which would suffice to convict. The quantum of information which constitutes probable cause—evidence which would 'warrant a man of reasonable caution in the belief' that a felony has been committed, Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543—must be measured by the facts of the particular case. * *

"Whether or not the requirements of reliability and particularity of the information on which an officer may act are more stringent where an arrest warrant is absent, they surely cannot be less stringent than where an arrest warrant is obtained. * * *

"* * * We have held that identification of the suspect by a reliable informant may constitute probable cause for arrest where the information given is sufficiently accurate to lead the officers directly to the suspect. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327. * * *"

In the Henry Case mentioned above, 80 S.Ct., at 171 (1959) the United States Supreme Court said:

"Evidence required to establish guilt is not necessary. * * * On the other hand, good faith on the part of the arresting officers is not enough. Probable

cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed. * * * It is important, we think, that this requirement be strictly enforced, for the standard set by the Constitution protects both the officer and the citizen. If the officer acts with probable cause, he is protected even though it turns out that the citizen is innocent. * * *"

In Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948) the United States Supreme Court was in essence considering the legality of a search, but with respect to arrest it stated:

"The Government contends, however, that this search without warrant must be held valid because incident to an arrest. This alleged ground of validity requires examination of the facts to determine whether the arrest itself was lawful. Since it was without warrant, it could be valid only if for a crime committed in the presence of the arresting officer or for a felony of which he had reasonable cause to believe defendant guilty."

"Probable cause has been defined as a reasonable grounds for belief of guilt. It exists where the facts and the circumstances within the officer's knowledge are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being com-

mitted. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543; Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879." State of Louisiana ex rel. Naylor v. Walker, 206 F.Supp. 544, Cert. Denied, 371 U.S. 957, 83 S.Ct. 514, 9 L.Ed.2d 504 (1963).

"An arrest is a wholly different kind of intrusion upon individual freedom from a limited search for weapons, and the interests each is designed to serve are likewise quite different. An arrest is the initial stage of a criminal prosecution. It is intended to vindicate society's interest in having its laws obeyed, and it is inevitably accompanied by future interference with the individual's freedom of movement whether or not trial or conviction ultimately follows." Terry v. State of Ohio, 392 U.S. 1, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889 (1968). Cf. Sibron v. State of New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917.

"A case of arrest without a warrant necessitates striking a balance as to (a) considerations respecting the rights of the individual citizen taken into custody, and (b) consideration respecting the responsibility of police officers for the safety and security of all members of the community; i. e., the propriety of law enforcement or police action. It is a problem of value judgment. The test, purely and simply, is one of reasonableness, considering the time, the place, and

the pertinent circumstances." Plancich v. Williamson, 57 Wash.2d 367, 357 P.2d 693, 92 A.L.R.2d 559.

" * * * That the officer had time to have obtained a warrant and failed to do so does not make an otherwise legal arrest or legal search and seizure illegal. Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145." State of Louisiana ex rel. Naylor v. Walker, 206 F.Supp. 544, 546.

In Louisiana an arrest by an officer without a warrant may be made when "the peace officer has reasonable cause to believe that the person to be arrested has committed an offense although not in the presence of the officer." LSA–C.Cr.P., Art. 213(3). "The law has not ordained hard and fast rules for the determination of reasonableness. The facts and circumstances of each case must be judged separately, with wide latitude accorded the trier of facts. That determination should not be overturned unless there is clear error." State v. McIlvaine, 247 La. 747, 174 So.2d 515, 520. Cf. State v. Aias, 243 La. 945, 149 So.2d 400; State v. Christiana, 249 La. 247, 186 So.2d 580; State v. Pagnotta, 253 La. 770, 220 So.2d 69; State v. Devenow, 253 La. 796, 220 So.2d 78. " * * * the Government has the burden of showing probable cause to believe that a crime had been or was being committed both in obtaining a warrant prior to arrest and in sustaining the legality of an arrest without a warrant. * * *" United States v. Rivera, 2 Cir., 321 F.2d 704. Cf. Beck v. State of Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142; 6 C.J.S. Arrest § 5 a., p. 580.

■ We find that defendant's arrest was legal. At the time of his arrest armed robberies were widespread in the City of New Orleans. The facts supra disclose that Captain Newman had informants on whom he relied. One confidential informant conveyed reliable information to him, and this information pointed out the defendant as having committed some of the then recent truck driver robberies. The information was immediately relayed to Lt. Feld who trusted and believed his superior officer. The Lieutenant was alert to the tense situation existing among truck drivers handling money receipts. Sgt. Vigurie was a coworker with Lt. Feld. There was a chain of command, which is usual for all large operations whose procedures are intricate, involving many police officers; six officers were detailed to the instant arrest.

A prudent man of reasonable caution, considering the time, place, and pertinent circumstances,—and having the facts available to him which Lt. Feld had in his personal possession and immediate knowledge (although they might not have been written on papers on his person)—would, in our opinion, have certainly believed that the defendant was guilty of armed robbery. Again, in our opinion, there would have

been more than suspicion. Substantiating this conclusion is the fact that Marion Catalano, the Brown's Velvet driver, had identified a mug shot of the defendant as that of the man who had robbed him.

 We conclude that Lt. Feld, Sgt. Vigurie, and the other officers—under the totality of the circumstances—acted under more than good faith and suspicion; they had probable cause to arrest the defendant. There was no reason why a warrant of arrest could not have been secured, but the failure to secure the warrant did not invalidate defendant's arrest. State of Louisiana ex rel. Naylor v. Walker, supra.

The officers did not break into defendant's home; there was no forceful entry; they were admitted by defendant's wife. Therefore, the entry was legal. Cf. Sabbath v. United States, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968).

When arrested, defendant was told that he was being arrested for armed robbery. This statement was sufficient to apprise him why his freedom of movement was suffering an interference.

We find that the State bore its burden of proving that defendant's arrest was constitutional and legal, and that there was probable and reasonable cause for such. The sum total of the facts and circumstances of this prosecution more than warrant such a conclusion. United States v. Elgisser, 2 Cir., 334 F.2d 103 (1964).

 The fact that defendant was booked some four hours after he was arrested does not make his arrest illegal. As stated supra, he was interrogated, but none of his statements were introduced in evidence. Defendant suffered no deprivation of his constitutional rights.

 Having found that the defendant was legally arrested, we proceed to a determination of the constitutionality vel non of the instant line-up. When the line-up occurred, defendant was in legal custody and under no arrest. We find no impairment, Federal or State, to a line-up conducted under constitutional standards. Here, as stated supra, defendant was represented by able counsel at a critical stage of his prosecution; there was no prohibited self incrimination.[4]

4. "Since it appears that there is grave potential for prejudice, intentional or not, in the pretrial lineup, which may not be capable of reconstruction at trial, and since presence of counsel itself can often avert prejudice and assure a meaningful confrontation at trial, there can be little doubt that for Wade the post-indictment lineup was a critical stage of the prosecution at which he was 'as much entitled to such aid [of counsel] * * * as at the trial itself.' Powell v. State of Alabama [supra], 287 U.S. 45 at 57, 53 S.Ct. 55 at 60, 77 L.Ed. 158. Thus both Wade and his counsel should have been notified of the impending lineup, and counsel's presence should have been a requisite to conduct of the lineup, absent an 'intelligent waiver.' See Carnley v. Cochran, 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70. * * *" United States v. Wade, 87 S.Ct. at 1937 (1967).

"We have no doubt that compelling the accused merely to exhibit his person for observation by a prosecution witness prior to trial involves no compulsion of the accused to give evidence having testimonial significance. It is compulsion of the accused to exhibit his physical characteristics, not compulsion to disclose any knowledge he might have. It is no different from compelling Schmerber to provide a blood sample or Holt to wear the blouse, and, as in those instances, is not within the cover of the privilege. Similarly, compelling Wade to speak within hearing distance of the witnesses, even to utter words purportedly uttered by the robber, was not compulsion to utter statements of a 'testimonial' nature; he was required to use his voice as an identifying physical characteristic, not to speak his guilt. * * *" United States v. Wade, (1967) 388 U.S. 218, 87 S.Ct. 1926, 1930, 18 L.Ed.2d 1149.

We conclude that the pretrial line-up herein was legal, and that the picture of the line-up (S–1), which includes as No. Four the photograph of the defendant, was properly admitted in evidence. We further find that evidence of the pretrial line-up identification by the victim was properly admitted in evidence. There was no need for suppression.

The record also discloses that there was an in-court identification at trial. The

testimony with respect to this identificaton is as follows:

"Q. Do you [victim] see this person in Court today?

"A. I do.

"Q. Would you point him out, please?

"A. That gentleman right there (indicating).

"Q. Is this the same gentleman that held you up on December 26, 1967?

"A. It is."

Defendant suffered no violation of his constitutional rights by either the pretrial line-up identification or by the in-court identification. The trial judge was correct in admitting such in evidence. Cf. State v. Allen, 251 La. 237, 203 So.2d 705; State v. Miller, 254 La. 73, 222 So.2d 862; State v. Lewis, 255 La. 134, 229 So.2d 726.

Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), is not apposite to the instant matter. No legal arrest was involved in that case. The United States Supreme Court distinctly said, "The legality of his arrest was not determined by the Mississippi Supreme Court." The Court then held the fingerprints taken during a period of detention unconstitutional evidence which could not be admitted during trial.

Specification of Errors No. 1 is without merit.

SPECIFICATION OF ERRORS NO. 2

■ We find no merit in Specification of Errors No. 2 which contends that the verdict of guilty in which only nine out of twelve jurors concurred denied appellant due process and equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution.

Article 782 of the Code of Criminal Procedure provides:

"Cases in which the punishment may be capital shall be tried by a jury of twelve jurors, all of whom must concur to render a verdict. Cases in which the punishment is necessarily at hard labor shall be tried by a jury composed of twelve jurors, nine of whom must concur to render a verdict. Cases in which the punishment may be imprisonment at hard labor, shall be tried by a jury composed of five jurors, all of whom must concur to render a verdict. * * *"

The Sixth Amendment to the United States Constitution provides that, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining Witnesses in his favor, and to have the Assistance of Counsel for his defence."

Thus far, the United States Supreme Court has not ruled that the Sixth Amendment compels the States under the Fourteenth Amendment to the United States Constitution to require that the verdict of the jury be unanimous in a criminal prosecution such as the instant one. Herein, therefore, our ruling in State v. Schoonover, 252 La. 311, 211 So.2d 273, which upheld the ruling of the trial judge refusing to charge the jury that, "The verdict of the Jury, either to acquit the defendant or to convict him [armed robbery] must be by the unanimous vote of the entire jury," is applicable. In Schoonover we said, "These arguments do not impress us. We are entirely satisfied that the Constitution and laws of our state provide a system for this prosecution in which fundamental fairness and even-handed justice can be and was dispensed. * * *" We are still of the same belief.

Specification of Errors No. 2 is without merit.

For the reasons assigned, the conviction and sentence are affirmed.