LARRY G. SMITH, Judge.
Appellant, Clinton Eugene Sloan, Jr., was tried on a charge of second degree murder, and found guilty by a jury of manslaughter. The issues raised on appeal are: (1) Appellant’s incriminating statement given to police officers should have been suppressed because it was obtained as the result of a warrantless arrest inside the mobile home he was jointly occupying with others at the time; (2) the evidence was insufficient for submission to the jury, and appellant’s motion for judgment of acquittal should have been granted; (3) it was error to permit introduction into evidence of appellant’s knife, upon which was found a trace of human blood; and (4) it was error to allow the state’s rebuttal witness to testify that one of the defendant’s witnesses was a drug dealer. We affirm on all points.
Only the first point has been extensively briefed and argued. Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), held that the Fourth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, prohibits law enforcement officers from making a warrantless, noncon-sensual entry into a suspect’s home, in the absence of exigent circumstances, in order to make a routine felony arrest. Appellant argues, consistent with Payton, that appellant’s arrest was unlawful, and therefore, incriminating statements made by him shortly after his arrest should have been excluded under the Wong Sun rule. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
The facts surrounding the homicide, the ensuing arrest of appellant, and the obtaining of his incriminating statement and other evidence by police officers are: In the early morning hours of Thanksgiving Day, 1980, outside B.J.’s Lounge in Bay County, Florida, appellant had the last in a series of arguments with his girlfriend, Wanda Bush. Appellant tried to drag Wanda into a car to take her home, but Wanda resisted, broke away, and stalked back toward BJ.’s. The victim, Mark Sprague, had pulled his car to the front door of B.J.’s to pick up some friends. Mark and Wanda, for some reason, exchanged insults, whereupon Mark left his car, grabbed Wanda by the hair, and hit her in the face. As Wanda and Mark began to wrestle, appellant joined the fracas. It is uncertain how many other patrons of B.J.’s joined in the affray, but at least one did. At some point the victim was heard to exclaim, “Man, don’t cut me.” During the fight the victim was cut three times on the back and legs, and once in the chest. The latter wound pierced his heart, resulting in his death within minutes.
The police arrived shortly after the fight, rounded up the crowd at B.J.’s, and took them to the police station for questioning. Apparently, all of those involved in the fight had remained at B.J.’s except the *356 appellant, Sloan, who had gone home. Home, at that time, was a mobile home owned by Wanda and her sister, Cynthia Martin, located in a trailer park. Appellant had been living there with Wanda for about a month, occupying one of the three bedrooms with Wanda. Sloan paid no rent, but sometimes bought groceries. On the day previous to his arrest, Sloan had removed his clothing from the mobile home and was seeking another residence.[1]
At about 5:30 a. m., four police officers in three police cars arrived at the trailer. At the time of their arrival, Cynthia Martin, her boyfriend, her children, Wanda’s child, and appellant Sloan were in the trailer. Appellant had gone to bed in the bedroom he shared with Wanda Bush. Cynthia Martin and her boyfriend, who had no possesso-ry interest, but was merely a guest, were sleeping in the front bedroom and were awakened by the officers’ knock. When the door was opened (swinging outwards) the police stepped just inside the door. Cynthia’s boyfriend demanded to know if the officers had a warrant, to which they responded in the negative. He then ordered the police out, pushing the first officer back. The police stepped outside but did not leave. One officer went to his patrol car to request instructions, and another knocked on the door again. That officer informed Cynthia that Wanda or appellant was in trouble. Cynthia still refused to open the door. The police knocked a third time and this time stated that it was really necessary that they talk to appellant. This time Cynthia invited the officers in. Both Cynthia and her boyfriend first denied knowing Sloan, or that he was present in the trailer; however, after further discussion, Cynthia told the officers that appellant was in the bedroom. After some further discussion, she stated that she wanted to get a child out of the bedroom where Sloan was sleeping. The police followed her into appellant’s bedroom, where they woke him, allowed him to dress, and proceeded to take him into custody.
Prior to the incident in question a capias had been issued by a county judge of the county for the arrest of appellant for his failure to appear in court on a misdemeanor charge. It is not clear whether all of the officers who arrived outside appellant’s residence that morning knew of the existence of the capias, but it is clear that Deputy Sheriff Hughes, who was one of the two officers who first entered the trailer, had the capias in his patrol car. It is undisputed that the officers did not inform Cynthia or her boyfriend of the existence of the capias nor did they inform appellant while inside the mobile home that he was being arrested on the capias. Instead, the officers indicated that they were taking appellant to the station for the purpose of questioning him concerning the incident outside of B.J.’s. However, the testimony of the officers confirms that once outside the mobile home, one of the officers exhibited the capias to appellant, and he was informed that it was a warrant for his arrest. Appellant testified that he was informed that he was being arrested for “murder, possibly,” and admitted also that there was conversation in the police car about a cápias for his arrest. The officers testified that appellant was advised of his rights upon being awakened, and again before being placed in the patrol car outside.
At approximately 6:30 a.m., upon arrival at the police station, appellant was again advised of his rights, and he also signed a written acknowledgment and waiver of rights. Appellant then gave a statement denying that he had cut the victim. However, he agreed to submit to a polygraph examination. After some lapse of time the *357 polygraph examiner called appellant into his office, at which point appellant said: “This is taking too long. I did it.” The officer read appellant his rights, appellant signed the rights form, and waiver of counsel, and a statement was given in which he admitted cutting the victim. This second statement was completed at 9:30 a.m.
After appellant’s initial questioning at the police station, one of the officers was directed to return to the mobile home to search for appellant’s knife. By the time the officer arrived, Wanda Bush had already called her sister, Cynthia, from the police station, to inform her the police were coming. Wanda instructed Cynthia to allow the police to search, and Cynthia agreed that she intended to do so. Because the officers’ initial search for the knife was unsuccessful, he requested Cynthia’s assistance. She then informed the officer that when appellant returned home the night before, he had given the knife to her. He also stated, according to her, that he thought he might have cut someone, but was not sure. Cynthia then took the officer to her bedroom and removed the knife from her cowboy hat which was hanging on the wall.
The trial judge denied the motion to suppress appellant’s incriminating statements, as well as appellant’s knife, which was earlier obtained by the officers. No explanation is given in the order as justification for appellant’s arrest and detention except that the officer’s entry of the mobile home was by a valid consent given by Cynthia Martin.[2] There are two aspects of the consent issue: First, did Cynthia Martin give her free and voluntary consent; and second, if she did validly consent to the entry of the mobile home by police officers, would her consent be binding upon appellant and extend to appellant’s privately occupied bedroom where he was sleeping at the time of his arrest? As to the first question, the ruling of the trial court is presumed correct, and upon consideration of the evidence, in its entirety, we cannot say that the court erred in finding a free and voluntary consent. See, Ferguson v. State, 417 So.2d 631 (Fla.1982); compare State v. Morgan, 423 So.2d 478 (Fla. 1st DCA 1982) (opinion filed December 10,1982), and cases therein cited. However, the consent issue, in our opinion, is not dispositive of the admissibility of appellant’s later confession given while he was lawfully in custody under the capias for his arrest. Therefore, we do not find it necessary to labor the issue of the scope of cotenant Cynthia Martin’s consent.[3]
Although appellant presents arguments and citations of authority predicated upon the assumption that there was “no warrant . . . involved” (appellant’s brief, page 10), appellant nevertheless admits the existence of the capias, the validity of which is not *358 questioned.[4] Furthermore, even though the trial court’s order mentions only consent as the basis for finding that appellant was lawfully in custody when he gave his confession, it is clear from the state’s written memorandum filed with the trial court that the state also relied — as we do here — upon the authority of the capias for validation of appellant’s seizure and detention. We interpolate that at least with respect to entry of the commonly occupied portions of the mobile home, the “knock and announce" statute (Section 901.19(1), Florida Statutes, does not apply, since the entry was by consent. Griffin v. State, 419 So.2d 320 (Fla. 1982); State v. Steffani, 898 So.2d 475 (Fla. 3rd DCA 1981), affirmed, sub nom Steffani v. State, 419 So.2d 323 (Fla.1982); Busch v. State, 392 So.2d 272 (Fla. 1st DCA 1980).
The crux of this case, although we arrive at it by a somewhat circuitous route, is whether the conduct of the officers in entering appellant’s privately occupied bedroom, assuming (without deciding), that the entry exceeded the scope of his cotenant’s consent, and their conduct in failing to advise appellant of the warrant and of their intention to arrest him under it immediately upon seizing him in his bedroom (as required under the arrest statute, Section 901.16, Florida Statutes), so tainted his later confession as to require exclusion under Wong Sun, supra, and its progeny. We hold that it does not.[5]
In Johnson v. Louisiana, 406 U.S. 356, 92 5.Ct. 1620, 32 L.Ed.2d 152 (1972), the appellant urged that his nighttime arrest at his home[6] without a warrant was unlawful,[7] and that his subsequent lineup identification was a forbidden fruit of the invasion of his Fourth Amendment rights. Rejecting this contention, the court held that there was “no evidence that might properly be characterized as the fruit of an illegal entry and arrest” used against him at the trial. The court based its decision upon the circumstance that prior to the lineup, at which Johnson was represented by counsel, he was brought before a committing magistrate to advise him of his rights and set bail. This intervening event, the court found, insulated the lineup identification from the illegality of his prior arrest. Said the court (406 U.S. at 365, 92 S.Ct. at 1626):
... At the time of the lineup, the detention of the appellant was under the authority of this commitment. Consequently, the lineup was conducted not by “exploitation” of the challenged arrest but “by means sufficiently distinguishable to be purged of the primary taint.” Wo *359 ng Sun v. United States, ... (citation omitted).
The result reached in Johnson v. Louisiana, guides our decision here. At the time appellant gave his incriminating statement he was in lawful custody under the warrant for his arrest for failure to appear. There was no verbal evidence which derived “so immediately from an unlawful entry and an unauthorized arrest,” Wong Sun, 871 U.S. 485, 83 S.Ct. 416, as to require suppression of his confession.[8] We find further support for our reliance upon Johnson for the conclusion that the arrest under the capias was an intervening event, for Wong Sun purposes, in Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). There the court declared: “The question whether a confession is the product of a free will under Wong Sun must be answered on the facts of each case. No single fact is dispositive ....” Id. at 603, 95 S.Ct. at 2261. “The temporal proximity of the arrest and the confession, the presence of intervening circumstances, see Johnson v. Louisiana, ... [citations omitted] and, particularly, the purpose and flagrancy of the official misconduct are all relevant. See Wong Sun v. United States, 371 U.S. at 491, 83 S.Ct. at 419, .... ” (emphasis supplied). Id. at 603, 604, 95 S.Ct. at 2261, 2262. We conclude, consistent with the analysis indicated under Brown, Johnson and Wong Sun, that appellant was lawfully placed under arrest on the capias immediately upon his removal from the mobile home, even if there were irregularities in the officers’ entry and seizure of appellant inside. We note that the Brown court eschewed the adoption of any “per se” or “but for” rule (422 U.S. at 603, 95 S.Ct. at 2261). It cannot be argued, therefore, that “but for” appellant’s removal from the mobile home he would not have been later sitting in the office of the polygraph examiner, where he confessed to the crime.
The remaining points on appeal require no extended discussion. The evidence would fully support a verdict of second degree murder for this senseless killing of a human being that occurred outside a Bay County drinking establishment. The knife in question was retrieved by police from Cynthia Martin, who said that the appellant had handed it to her upon his return to the mobile home on the night in question, and it was voluntarily retrieved by her along with the hat in which she had placed it inside the mobile home in a place not shown to have been exclusively occupied by appellant. As to the matter of the rebuttal witness produced by the state, it appears that the witness was testifying from personal knowledge, and the matter of the defense witness’ drug dealing activities had at least some bearing upon his credibility in view of his testimony tending to implicate another purported drug dealer as the perpetrator of the homicide. We find no reversible error on these issues.
The judgment of conviction and sentence are hereby AFFIRMED.
JOANOS and THOMPSON, JJ., concur.

. For Fourth Amendment purposes, there is little doubt that the mobile home was still appellant’s place of residence, his “dwelling.” See, Shade v. State, 400 So.2d 850 (Fla. 1st DCA 1981), and cases therein cited. Further, the testimony of Cynthia Martin and appellant established that the bedroom where appellant was sleeping was considered by the occupants as the more or less “exclusive” domain of appellant and his girlfriend, Wanda, and her child, with only limited rights of access by Cynthia, as on the occasion in question when she entered to remove Wanda’s child. See infra, footnote 3, for further discussion concerning the scope of a cotenant’s consent.

. It should not be overlooked that a consensual entry for the purpose of arrest also requires another element, namely, probable cause. Payton v. New York, supra. The state made no effort to establish the existence of probable cause for arrest on the homicide charge, nor the presence of exigent circumstances.

. The Fourth Amendment, according to Payton v. New York, supra, “has drawn a firm line at the entrance to the house.” 445 U.S. 590, 100 S.Ct. 1382. It may well be that when consent is relied upon as the sole justification for a search and seizure, the cotenant consent rule, as interpreted in Silva v. State, 344 So.2d 559 (Fla.1977), requires that a second line be drawn at the threshold of another occupant’s private rooms within the house. Silva v. State, recognized that a joint occupant has authority to consent to a search of jointly held premises if the other party is unavailable, but not when the other party is present and objecting. We have no difficulty in applying the cotenant consent rule to hold that a party assumes the risk that his cotenant will admit police officers to the portions of the dwelling occupied in common, and will confirm the presence of the other party in another' portion of the premises, as Cynthia Martin did here. However, whether a party sleeping,, in his own private bedroom is bound by his cotenant’s consent so as to authorize entry by police officers is another matter, which we are not called upon to decide. See, however, Myers v. State, 426 So.2d 986 (Fla. 1st DCA 1983), holding that evidence seized from a sleeping defendant’s bedroom was admissible, where access of police officers had been gained by consent of defendant’s coten-ant, who had joint access to the bedroom.

. Section 901.28, Florida Statutes (1981), provides for issuance of a notice to appear on misdemeanor charges, and Section 901.32 provides for issuance of an arrest warrant for failure to appear pursuant to notice. To the same effect, see Rule 3.125, Florida Rules of Criminal Procedure, paragraph (g); and see Rule 3.130, paragraph (h), providing for arrest upon breach of the condition of a bail bond. No reason has been suggested why a warrant issued under these provisions would not satisfy the warrant requirement of Payton v. New York, supra.

. Even if, as appellant argues, the officers were acting upon the mistaken belief that Cynthia Martin’s consent authorized them to enter appellant’s private bedroom and to arrest him on the homicide charge, and though they lacked probable cause to arrest on that charge, their mistaken belief would have no bearing on the validity of the arrest under the authority of the warrant. See, Thomas v. State, 395 So.2d 280 (Fla. 3rd DCA 1981); Wigfall v. State, 323 So.2d 587 (Fla. 3rd DCA 1975); State v. Foust, 262 So.2d 686 (Fla. 3rd DCA 1972); Chaney v. State, 237 So.2d 281 (Fla. 4th DCA 1970); and Hoskins v. State, 208 So.2d 145 (Fla. 3rd DCA 1968).

. Additional facts in the Johnson case, as recited in the opinion of the state court on appeal, are that the police officers knocked on Johnson’s front door, and were admitted by Johnson’s wife. They showed Mrs. Johnson and a male occupant their identification, and informed them they were looking for Frank Johnson. The police officers then removed Johnson from under his bed and. arrested him for armed robbery. State v. Johnson, 255 La. 314, 230 So.2d 825, 827 (La.1970).

. Johnson urged invalidity of his arrest because of the absence of a valid excuse for the officers’ failure to obtain a warrant. There appears to be no question but that the officers had probable cause. Johnson v. Louisiana, 406 U.S. 365, 92 S.Ct. 1626.

. The facts in Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), are similar in that the officers did not have sufficient information to obtain a warrant when they took Dunaway into custody in connection with an attempted robbery and homicide, and took him to police headquarters where, after being given Miranda warnings, he gave incriminating statements. However, in Dunaway, as in Brown v. Illinois, supra, there was no valid basis for lawful detention at the time of the confession, and no intervening circumstances of such nature as would eliminate the taint of the initial unlawful arrest.