685 So.2d 151 (1996)
STATE of Louisiana, Plaintiff-Appellee,
v.
Shawn James GASPARD, Defendant-Appellant.
No. CR95-1643.
Court of Appeal of Louisiana, Third Circuit.
May 8, 1996.
Writ Granted June 28, 1996.
*152 Michael Harson, Keith A. Stutes, Asst. Dist. Atty., Lafayette, for State of Louisiana.
Alfred Frem Boustany II, Lafayette, for Shawn James Gaspard.
Before YELVERTON, KNOLL and COOKS, JJ.
YELVERTON, Judge.
This supervisory writ application by the defendant, Shawn Gaspard, has been remanded to this court by order of the Louisiana Supreme Court. Shawn Gaspard and his codefendant, Mitchell Hebert, are charged with first-degree murder. Both defendants originally filed pretrial writ applications with this court of appeal seeking review of trial court rulings denying several motions including a motion to suppress, a motion to exclude other crimes evidence, and a motion to quash. We denied the writ applications. Defendant Gaspard applied for a writ of certiorari with the Louisiana Supreme Court. The supreme court granted a stay and remanded the matter to us for briefing, argument, and issuance of an opinion concerning the motion to suppress the confession. State v. Gaspard, 96-0300 (La. 2/5/96), 667 So.2d 525. We are now at the opinion stage of the remand.

FACTS:
The following narration of facts is taken from the testimony of the police officers and Gaspard at the motion to suppress. It is based also on this court's observation of the two-hour videotape of Gaspard.
The Lafayette Police Department received a call at 9:00 a.m. on October 2, 1992, that there had been a homicide at the Green Oaks Lounge on Guilbeau Road in Lafayette. Inside the lounge, the police found the body of Gerald Green, the manager of the lounge, behind the bar; the victim had been beaten, and his throat slashed from ear to ear. Money and receipts from a money box were on the floor. There were two separate sets of bloody footprints at the scene. An investigation proceeded on the assumption that two men had committed the crime.
That same lounge had been burglarized eleven days earlier, on September 21, 1992, but no suspects had been found. A residential burglary had been committed just one week earlier at the Bell Downs Townhomes and Condominiums located directly behind the Green Oaks Lounge. A fingerprint from Shawn Gaspard had been found at the scene of the residential burglary, and an arrest warrant for Gaspard was outstanding. As of October 2, 1992, Gaspard had not been located and arrested on the burglary warrant. When the lead detective, Detective Ted Vincent, learned about the recent criminal activity in the locale, and the discovery of Gaspard's fingerprint, he directed Detective *153 Kelly Gibson and Detective Hundley to find Gaspard and bring him in for questioning.
Detective Gibson learned from Gaspard's mother that he was living on Guilbeau Road in the Gallery Apartments, about one block from the Green Oaks Lounge. While searching for Gaspard at the Gallery Apartments, the detectives found out that Gaspard and Hebert were keeping company and living with others at that apartment complex.
When the detectives spoke with Heather Findley and Crystal Fontenot, the women that Hebert and Gaspard were living with in the Gallery Apartments, one of the women said that both men had been out the night before, and that they had come in at 3:50 a.m. that morning. She related that when she asked them why they came in so late, both men insisted that they came home at 1:30 a.m. This, according to the informing roommate, made her suspicious; she was certain about the time when the men came home.
At the time the police talked to these women, they were in the apartment; neither Gaspard nor Hebert were home; it was explained that they had left at 9:00 a.m. telling their roommates they were going to Penrod Drilling to apply for jobs. The detectives checked at Penrod Drilling later and discovered that neither Gaspard nor Hebert had been there.
Detective Vincent joined the other detectives around noon at the Gallery Apartments, and together they continued to look for Gaspard and Hebert. At about 1:00 p.m. that afternoon, Detective Vincent saw two men in the complex and asked them their names; they were Mitchell Hebert and Shawn Gaspard. Gaspard was immediately arrested on the outstanding burglary warrant. Mitchell Hebert was asked to come down to the police station for questioning.
As the detectives were going to their cars to leave the Gallery Apartments Evelyn Everett, a woman from the apartment complex next door, hollered for them. Detective Vincent responded. She wanted to know if Shawn Gaspard had been arrested. When Detective Vincent said he had, she handed them a shopping bag, saying that Gaspard had left it with her, and that she wanted nothing to do with what Gaspard may have done. Inside the shopping bag the detectives found newly purchased clothing with receipts indicating that the clothes were purchased at 10:00 a.m. and 12:00 noon, that very day. The defendants had already left for the police station and they were not aware that the police knew about this shopping bag.
At the police station, the police first took the written statements of Heather Findley and Crystal Fontenot. Then Detective Gibson began to speak with Mitchell Hebert. His questioning began at 2:30 p.m., with the detective going over the rights form with him. After this, Hebert signed the rights form, and he began to talk with the detective: Hebert claimed he had returned to his apartment at 1:30 a.m. and that he had gone to Penrod Drilling at 9:00 a.m. to apply for a job. Detective Gibson had found a gold chain in a jacket when Gaspard was arrested. When the detective showed the chain to Hebert, he said he received it from either Heather Findley or Crystal Fontenot. When the detective asked Hebert about the shopping bag full of new clothes left with Evelyn Everett, Hebert became visibly shaken and nervous, and said, "I don't want to talk about it." The detective stopped the interview and left Hebert in the room.
Detective Vincent, meanwhile, was attending the autopsy. While waiting for him, Detective Gibson more closely examined the shopping bag of clothes and found over $600 in cash in the pockets. When Detective Vincent arrived at 4:00 p.m., Detective Gibson told him what had happened and what he had found in the shopping bag of clothes. Later, around 5:00 p.m., Detective Gibson found out from Heather Findley that the gold chain belonged to her; she said Mitchell Hebert had stolen it. Detective Gibson did not have a chance to tell Detective Vincent about Hebert stealing the jewelry from Heather Findley because by then Detective Vincent was talking to Hebert.
Detective Vincent had gone in to talk with Hebert a little after 4:00 p.m. The detective thanked Hebert for staying and talking to him. He went over the advice of rights form *154 Hebert had signed with Detective Gibson; when he was finished, Hebert told Detective Vincent he had no problems talking with him. Detective Vincent outlined the evidence the police had obtained concerning the murder and the suspicious activities. The two men continued to talk, taking breaks to eat, drink or smoke, until Mitchell Hebert began to confess at 6:45 p.m. Mitchell Hebert's full confession was videotaped shortly after 7:00 p.m.
While Hebert was being interviewed, Gaspard was held in another room. Gaspard was being held not only for questioning about the murder of Gerald Green, but also for the outstanding arrest warrant for the residential burglary near the murder scene. In a videotape of Gaspard, beginning at 6:30 p.m., Gaspard denied any knowledge about the murder. When the police told Gaspard that Hebert had confessed to killing Green, and that he had implicated Gaspard as an accomplice to the murder and robbery, Gaspard demanded to see Hebert. Although Hebert at first refused to see him, Hebert eventually went in to tell Gaspard, "It's over." At this point Gaspard told Detective Vincent he would talk about the crime, but he asked if he could wait until Monday. Detective Vincent told Gaspard he would have to contact the detective since the detective could not go to the jail and initiate contact with him. Gaspard was given the detective's card with his beeper number, and he was taken to be processed for a search warrant for hair and blood samples.
According to Detective Vincent, later that evening while Gaspard was waiting for the necessary paperwork to be completed, Gaspard approached Detective Vincent and told the detective he was ready to talk. Thereafter, Gaspard gave a recorded statement. It was this statement, or confession, that was the subject of the motion to suppress.
At the hearing, Gaspard denied that things occurred that way and claimed that he requested a lawyer. According to Gaspard, the detectives told him that he could not see a lawyer since it was Friday, and that he would have to wait until Monday. When asked why he told Detective Vincent he would talk to him about the murder on Monday, a fact established by the videotape, Gaspard testified he said that to the detective in the hope that he would have a lawyer by Monday. Gaspard argued at the hearing that when he denied any knowledge about the murder (the videotape shows him repeatedly saying "I don't know nothing about no murder"), he was invoking his right to remain silent, and he argued that the police failed to honor his invocation of his Miranda right by continuing to question him about the murder.
Gaspard, at the hearing, further testified that Detective Vincent came to him, while the police were doing paperwork for a search warrant to seize blood and tissue samples, and told him "You know you're facing a death penalty or you're facing life or death?", and that the detective then said "Look, Mitch already told us what happened, but he left your name out of the murder ... it's in your best interests if you give a statement, I'll be happy to go talk to the D.A. for you and try to cut you a good deal." According to Gaspard, it was at that point that he gave the taped statement to Detective Vincent.
When Gaspard, at the hearing, made a specific allegation of police misconduct in obtaining his statement, the State presented rebuttal evidence. Detective Vincent, in rebuttal, gave his version of what happened right after Gaspard stopped him and asked to give a statement and before he made his statement:
BY MR. BOUSTANY:
Q. All right. And you were asked specifically about did you remember telling him that, look, he was looking at the death penalty, and that if he gave a statement it would help. Do you remember saying that?
BY DETECTIVE VINCENT:
A. I don't recall any indication when I brought up the death penalty. Shawn stated that, "Would it help?" And I said, "Anything you tell me as far as cooperation goes into a report, that report goes to the D.A. and they read it." And they would take that under consideration.
From this Gaspard claims he was led to believe that if he gave a statement, he would avoid the death penalty.
*155 Gaspard further contended he was not read his rights until 8:15 p.m., but he claimed he requested a lawyer somewhere around 2:00 or 3:00 in the afternoon. The State questioned how he knew he had a right to a lawyer if he had not been read his rights before then. Gaspard also acknowledged that he did not tell either Detective Alfred or Detective Vincent that he wanted a lawyer, nor did he tell them he did not want to speak to them. Gaspard's discussions with these detectives was videotaped, but the alleged discussions with other detectives were not videotaped.
After Gaspard gave his statement, he and Hebert were taken to the University Medical Center to give blood, hair, and other tissue samples pursuant to the search warrants. Before he went to the hospital, Gaspard took the detectives to the area where he had hidden some of the money taken in the robbery. The police later recovered the shoes the defendants had worn during the murder and robbery; the defendants had purchased new shoes and then disposed of their old shoes in the trash at the Acadiana Mall.
At the conclusion of the hearing on the motions to suppress, the trial judge denied the motions finding that the police did not violate Mitchell Hebert's Miranda rights, and that Gaspard's and Hebert's statements were free and voluntary and not the products of fear, coercion, duress, or inducements. The trial court at the same time denied the motions to quash and granted the State's motion to introduce other crimes evidence.

MOTION TO SUPPRESS
To support his contention that the trial court erred in failing to suppress his confession, Gaspard first argues that the police were required by La.Code Crim.P. art. 228 to immediately book him in the jail after his arrest. La.Code Crim.P. art. 228 requires that the police, having an arrested person in their custody, "promptly ... conduct the person arrested to the nearest jail or police station and cause him to be booked." This provision does not mean the police must book the arrestee immediately. Instead, the police must be prompt in beginning the procedure to bring the arrestee before a magistrate in order that the arrestee may challenge his custody. In State v. Hopper, 251 La. 77, 203 So.2d 222 (1967), vacated and remanded for reconsideration in light of Bruton opinion, 392 U.S. 658, 88 S.Ct. 2281, 20 L.Ed.2d 1347 (1968), conviction affirmed on remand, 253 La. 439, 218 So.2d 551 (1969), cert. denied 396 U.S. 1012, 90 S.Ct. 545, 24 L.Ed.2d 504 (1970), the defendants were arrested but not booked in the parish jail until twelve hours later; the Louisiana Supreme Court found their confinement was legal at all times. Id. As is often the case, arrestees are interviewed immediately after their arrest, but they are not booked into the jail until after the investigators have had a chance to talk with them. It is interesting to note that at the end of the Gaspard video, Detective Vincent told Gaspard that, once he was booked in the jail, the detective could not go get him to interrogate him unless Gaspard called; that is why Vincent gave Gaspard his card with the detective's beeper number on it. This argument of the defendant is without basis.
Gaspard's primary argument is that the police, by continuing to question him about the murder, failed to honor his invocation of his right to remain silent. In his brief, he does not say when he invoked his right to remain silent; it appears that he considers his oft-repeated claim, "I don't know nothing about no murder" to have been tantamount to refusing to give a statement and invoking his right to remain silent. We agree with the trial judge that this assertion was not an invocation of his right to remain silent; in no way were the police put on notice by this utterance that he was asserting the right to remain silent about the murder investigation.
In State v. Simpson, 629 So.2d 468 (La.App. 3 Cir.1993), the defendant at first claimed he did not recall what happened on the morning he murdered his daughter or that nothing really happened, but when the police told him what they knew about the case, the defendant began to relate details about the stabbing. This court found that the defendant did not invoke his right to remain silent since he did not exercise any of his rights as an arrestee nor did he decline to *156 answer any questions. Id. An indecisive or equivocating statement may not be sufficient to invoke the protections of La. Const. art. 1, § 13. See State v. Perkins, 540 So.2d 556 (La.App. 3 Cir.1989).
Even when a defendant asserts his right to remain silent, the assertion of this right does not create a permanent barrier to further discussions. In State v. Hamilton, 94-696 (La.App. 5 Cir. 12/14/94), 648 So.2d 939, the defendant expressed a desire to wait 48 hours to answer police questions, and this was found sufficient to invoke the right to silence. In the present case, Gaspard invoked his right to remain silent for a time when he told Detective Vincent he wanted to wait until Monday to talk about his participation in the murder. However, it was Gaspard who later initiated further contact with Detective Vincent and offered to give a statement late Friday night. On the issue of whether the police may later speak to a defendant who has invoked his right to remain silent, the Louisiana Supreme Court has noted:
When a defendant invokes his constitutional right to silence, the validity of any subsequent waiver depends upon the `scrupulous honoring' of that right by the police. Michigan v. Mosley, 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). A majority of this court has concluded that the question of whether an accused's rights are `scrupulously honored' depends on the totality of the circumstances involved under the particular facts of each case. One factor to be considered is who initiates the further questioning. Other factors include `the time delay between the original request and subsequent interrogation, whether Miranda warnings were given before each separate interrogation, whether waiver of rights forms were signed, and whether or not pressures were asserted on the accused by the police between the time he invoked his right ... and the subsequent interrogation.' State v. Harper, 430 So.2d 627, 633 (La.1983).
State v. Brooks, 505 So.2d 714, 722 (La.1987), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).
In State v. Daniel, 378 So.2d 1361, 1366 (La.1979), the defendant told the police he did not want to talk, but an assistant district attorney told the defendant, "[B]efore you make up your mind one way or the other as to whether or not you want to talk to us, let me tell you what we've got." Thereafter, the defendant was informed of the evidence the police had indicating that he killed two people, and the defendant confessed to the murders and took the police to the area where the shotgun used in the murders was hidden. The Louisiana Supreme Court relied upon Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), to rule that the trial court should have denied the motion to suppress:
... Nothing in Miranda prevents an accused party from changing his mind and giving a statement after he has previously declined to do so, so long as the statement is voluntary and intelligently made. Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); Nash v. Estelle, 560 F.2d 652 (5th Cir.1977); State v. Strahan, 348 So.2d 79 (La.1977); State v. Peevy, 321 So.2d 324 (La.1975). In Mosley the Court said:
`... [A] blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests.'
The Mosley decision has been understood to mean that Miranda should not be construed to create a per se proscription of an indefinite duration upon further custodial interrogation of a defendant who asserts his right to remain silent. And an unrealistic approach to the concept of waiver of these rights can produce anomalous results; therefore, a pragmatic approach is dictated on a case-by-case basis: United, States v. Rodriguez-Gastelum, 569 F.2d 482 (9th Cir.1978).
Daniel, 378 So.2d at 1366.
Gaspard's claim that he knew nothing about the murder was not an invocation of the right *157 to remain silent. His request to wait over the weekend before he told the police about his participation in the murder was an invocation of his right to remain silent, but he himself later initiated the resumption of contact with Detective Vincent. Therefore, Gaspard's recorded confession was not taken in violation of his right to remain silent.
Gaspard further claims, as his second main argument, that he was led to believe that if he gave a statement he would avoid the death penalty. Before a confession may be introduced in evidence, the State has the burden of proving that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, inducements, or promises. La.R.S. 15:451; La.Code Crim.P. art. 703(D). In Louisiana the statutorily mandated test for voluntariness is not whether a confession was induced by improper external forces but whether the confession was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. State v. Jackson, 381 So.2d 485 (La.1980). The State has the burden of affirmatively proving that the confession was free and voluntary. La.Code Crim.P. art. 703(D); La.R.S. 15:451. Accordingly, it must rebut specific testimony introduced by the defendant concerning factual circumstances which indicate coercive measures or intimidation. State v. Gachot, 609 So.2d 269 (La.App. 3 Cir. 1992), writ denied, 617 So.2d 1180 (La. 1993), reconsideration denied, 620 So.2d 830 (La. 1993), cert. Denied, 510 U.S. 980, 114 S.Ct. 478, 126 L.Ed.2d 429 (1993). The admissibility of a confession is a question for the trial judge. His conclusions on credibility and the weight of testimony regarding the voluntariness of a confession for admissibility purposes will not be overturned on appeal unless they are unsupported by the evidence. Id.
In the Gachot case, this court noted:
A mild exhortation to tell the truth, or telling a defendant that if he cooperates that `things will go easier' will not negate the voluntariness of a confession. State v. Jackson, 523 So.2d 251, 259 (La.App. 2 Cir. 1988); State v. Cupit, 508 So.2d 996, 1005 (La.App. 2 Cir.1987). If it does not appear that the statements of the police were designed to overcome the defendant's will or to produce a coerced confession, then the statement is admissible. State v. Murray, supra [546 So.2d 944 (La.App. 3 Cir.1989)].
Gachot, 609 So.2d at 275.
See also, State v. Magee, 93-643 (La.App. 3 Cir. 10/5/94), 643 So.2d 497.
In the recent case of State v. Matthews, 26,550 (La.App. 2 Cir. 1/19/95), 649 So.2d 1022, writ denied, 95-0435 (La. 6/16/95), 655 So.2d 341, the defendant made a statement to the police about his involvement in a drug distribution conspiracy, but claimed he did so after he was told making such a statement would help him. The court refused to suppress the statement, noting:
A confession obtained by direct or implied promises, however slight, or by the exertion of any improper influence must be considered involuntary and inadmissible. State v. Morvant, 384 So.2d 765 (La.1980); [State v.] Leonard, supra [605 So.2d 697 (La.App. 2 Cir.1992)]. However, a mild exhortation to tell the truth, or a remark that if the defendant cooperates the officer will `do what he can' or `things will go easier,' does not negate the voluntary nature of the confession. [State v.] English, supra [582 So.2d 1358 (La.App. 2 Cir. 1991)]. Further, informing a defendant that the district attorney will be advised of any cooperation is insufficient to overcome the free and voluntary nature of a confession. State v. Vernon, 385 So.2d 200 (La.1980); State v. Jackson, 523 So.2d 251 (La.App.2d Cir.1988), writ denied, 530 So.2d 565 (La.1988).
Matthews, 649 So.2d at 1027 (Emphasis added).
Numerous cases have allowed statements to be admitted when the police simply inform a defendant that the district attorney would be informed about his cooperation. State v. Petterway, 403 So.2d 1157 (La.1981); State v. Vernon, 385 So.2d 200 (La.1980); State v. Landry, 502 So.2d 281 (La.App. 3 Cir.), writ denied, 508 So.2d 63 (La.1987); State v. Thomas, 470 So.2d 413 (La.App. 3 Cir.1985); State v. Lockhart, 629 So.2d 1195 (La.App. 1 *158 Cir.1993), writ denied, 94-0050 (La. 4/7/94), 635 So.2d 1132; State v. Sanford, 569 So.2d 147 (La.App. 1 Cir.1990), writ denied, 623 So.2d 1299 (La.1993); State v. Peters, 546 So.2d 829 (La.App. 1 Cir.), writ denied, 552 So.2d 378 (La.1989); State v. Peters, 542 So.2d 592 (La.App. 1 Cir.1989); and State v. Jackson, 523 So.2d 251 (La.App. 2 Cir.), writ denied, 530 So.2d 565 (La.1988). On the other hand, when the police actually make a promise to have the charge reduced or seek reduction in sentence in return for the defendant's statement, the courts do not hesitate to suppress the statement. State v. Leonard, 605 So.2d 697 (La.App. 2 Cir.1992); State v. Hankerson, 604 So.2d 1330 (La.App. 1 Cir. 1992).
Detective Vincent did not offer to have the murder charge reduced. His statement that Gaspard's cooperation would be noted in a report about the murder investigation to be submitted to the district attorney was not an improper inducement made to obtain a confession from Gaspard.
The issue concerning the confession is simply a credibility determination by the trial judge. Gaspard claimed that Detective Vincent promised to cut a deal if he gave a confession. The detective claimed that Gaspard was the one who asked if giving a statement would help, he simply informed Gaspard that such information would be put in a report and the district attorney would review it.
When the trial judge issues a ruling on a defendant's motion to suppress, the appellate court looks at the totality of the evidence presented at the hearing on the motion to suppress. The appellate court will not overturn a trial court's ruling unless the trial judge's conclusions are not supported by the evidence, or there exists an internal inconsistency in the testimony of the witnesses or a palpable or obvious abuse of discretion. State v. Burkhalter, 428 So.2d 449 (La.1983), and State v. Rios, 528 So.2d 163 (La.App. 3 Cir.), writ denied, 530 So.2d 83 (La.1988). The evidence presented in this case supports the conclusion of the trial judge. The trial judge did not err in denying Shawn Gaspard's motion to suppress.
For these reasons, finding that the trial judge ruled correctly, we adhere to our original opinion denying the writ application.
WRIT APPLICATION DENIED.