# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## KA 12-698

STATE OF LOUISIANA

VERSUS

JAMES CAROL BERTRAND

**********

APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 88689FB
HONORABLE THOMAS F. FUSELIER, DISTRICT JUDGE

**********

## BILLY HOWARD EZELL
## JUDGE

**********

Court composed of Marc T. Amy, Elizabeth A. Pickett, and Billy Howard Ezell, Judges.

**REVERSED; SENTENCE VACATED AND SET ASIDE; AND JUDGMENT OF AQUITTAL RENDERED.**

Glen Richard Petersen
Hymel Davis & Petersen, LLC
10602 Coursey Boulevard
Baton Rouge, LA 70816
(225) 298-8118
COUNSEL FOR DEFENDANT/APPELLANT:
    James Carol Bertrand

**Trent Brignac**
**District Attorney, Thirteenth Judicial District Court**
**Gregory J. Vidrine**
**Assistant District Attorney**
**P. O. Box 780**
**Ville Platte, LA 70586**
**(337) 363-3438**
**COUNSEL FOR APPELLEE:**
      **State of Louisiana**

**EZELL, Judge.**

The Defendant, James Carol Bertrand, was charged in an indictment filed on June 6, 2011, with the following: 1) extortion, a violation of La.R.S. 14:66; 2) aggravated kidnapping, a violation of La.R.S. 14:44; 3) aggravated kidnapping, a violation of La.R.S. 14:44; 4) false imprisonment with a dangerous weapon, a violation of La.R.S. 14:46.1; and 5) false imprisonment with a dangerous weapon, a violation of La.R.S. 14:46.1. The Defendant entered a plea of not guilty on July 21, 2011. On November 28, 2011, the trial court, on motion of the State, severed counts three and five. Jury selection followed. The jury returned a verdict on November 30, 2011, of not guilty as to count one, not guilty as to count two, and guilty of the responsive verdict of false imprisonment, a violation of La.R.S. 14:46, as to count four.

The Defendant filed a "Motion for New Trial and in Arrest of Judgment." The trial court denied the motion on February 16, 2012. The Defendant was subsequently sentenced to serve four months in parish jail, with all but ten days of the sentence suspended. The trial court ordered that the Defendant be placed on active supervised probation for one year upon his release from incarceration.

On March 9, 2012, the Defendant filed a motion to appeal. The Defendant is now before this court asserting one assignment of error. Therein, he contends the evidence was not sufficient to support his conviction. After review, we find the Defendant's conviction should be reversed.

## FACTS

Kimberly Campbell was arrested and charged with being a principal to operation of a clandestine laboratory. William Guidroz, Campbell's ex-boyfriend and the father of her child, contracted with the Defendant, a bail bondsman, for

Campbell's release from jail. Thereafter, Guidroz sought to be released as the indemnitor on Campbell's bond. The Defendant arrested Campbell on March 25, 2011, and brought her to his office so he could complete the paperwork necessary to surrender her to police. Subsequently, Guidroz spoke with Campbell at the Defendant's office and attempted to persuade her to sign over custody of their child in return for his remaining the indemnitor on her bond. Campbell refused. The Defendant subsequently attempted to surrender Campbell to police, but the police refused to accept her.

## ASSIGNMENT OF ERROR

The Defendant contends there was insufficient evidence upon which to find a bail bondsman guilty beyond a reasonable doubt of falsely imprisoning his principal after placing her under arrest.

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Mussall*, 523 So.2d 1305 (La.1988). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. *State v. Silman*, 95-0154 (La.11/27/95), 663 So.2d 27, 35. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. *State v. Bordenave*, 95-2328 (La.4/26/96), 678 So.2d 19, 20. It is not the function of an appellate court to assess credibility or re-weigh the evidence. *Id.*

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86.

The Defendant was convicted of false imprisonment, which is "the intentional confinement or detention of another, without his consent and without proper legal authority." La.R.S. 14:46.

The surrender of an individual by a surety is governed by La.Code Crim.P. art. 345 and La.R.S. 22:1585. Louisiana Code of Criminal Procedure Article 345(A) provides:

> A surety may surrender the defendant or the defendant may surrender himself, in open court or to the officer charged with his detention, at any time prior to forfeiture or within the time allowed by law for setting aside a judgment of forfeiture of the bail bond. For the purpose of surrendering the defendant, the surety may arrest him. Upon surrender of the defendant, the officer shall detain the defendant in his custody as upon the original commitment and shall acknowledge the surrender by a certificate signed by him and delivered to the surety. The officer shall retain and forward a copy of the certificate to the court. After compliance with the provisions of Paragraph F of this Article, the surety shall be fully and finally discharged and relieved, as provided for in Paragraphs C and D of this Article, of all obligations under the bond.

Louisiana Revised Statutes 22:1585 provides, in relevant part:

> A. Before a breach of an undertaking occurs, a surety or bail bond producer may surrender a defendant, or the defendant may surrender himself, to the official to whose custody the defendant was committed at the time the bail was given. The defendant may be surrendered without a return of the premium if he changes addresses without notifying his bail bond producer or surety, conceals himself, leaves the jurisdiction of the court without the permission of his bail bond producer or surety, fails to appear in any court at any time, or if the indemnitor seeks to relieve himself of his obligation on the bond or if the defendant is convicted of a felony but sentence is not yet imposed. A bail bond producer shall not surrender a client for nonpayment of a premium until thirty days after the date the bond is posted.

> B. When a bail bond producer or surety surrenders a defendant, the bail bond producer or surety must file written notification and a statement of surrender indicating the lawful reason for the surrender. The statement of surrender must be attached to the surrender or recommit form with a copy provided to the defendant, committing official, and court clerk. The bail bond producer must maintain a correct copy of the statement of surrender form in the defendant's file.

David Cedillo testified that on March 25, 2011, he owned Cedillo Bonding. At that time, the Defendant worked at the company. Cedillo testified that in certain situations, the law allowed for the surrender of an individual out on bond to any jail or courthouse in the State. Cedillo also testified that the individual would be brought in,

a twenty-five dollar fee paid, and the bondsman would then leave. Cedillo further testified that a surrender form was usually filled out.

Cedillo was with the Defendant when he went to Rollins Road to pick up Campbell. He indicated the Defendant wore a bail bond badge at that time. Once at the residence on Rollins Road, Cedillo informed Chad Ardoin, Campbell's boyfriend, who he was. Cedillo testified that Campbell was handcuffed and brought to the vehicle. On the drive back to the bonding office, Cedillo was dropped off at his other business. He subsequently met the Defendant and Campbell at the bonding office.

Cedillo testified that he believed Campbell was not taken directly to jail because they were waiting on Chad Ardoin's mother to get off work to see if Campbell's bond could be redone. Cedillo also testified as follows: "[W]e were trying to keep her out so we were gonna [sic] work with her. She was being nice. We were being nice. We were trying to keep her out. So we were gonna [sic] try to redo the bond for her." Cedillo further testified that if a surety wanted to be released from a bond, "we try to get in touch with the client and see if we can arrange something where we can get that person off and . . . re-do the bond."

Cedillo testified that Guidroz was either at the bonding office when he arrived or arrived shortly thereafter. Guidroz asked to speak to Campbell, and Campbell willingly spoke to him. Campbell spoke to Guidroz in an office, with the door open, for four to five minutes. Cedillo did not recall if Campbell was in handcuffs at that time. Cedillo testified there was no hollering or screaming between Guidroz and Campbell. Guidroz and Campbell subsequently went outside to smoke.

Cedillo testified that Guidroz and Campbell went back into the bonding office, and Guidroz informed him that he was going to remain on Campbell's bond. Ardoin

4

then walked in, and things were "on the verge of getting ugly." The Defendant then walked Campbell toward the courthouse, and Cedillo left.

Cedillo testified that he was at his office approximately thirty minutes. Cedillo testified that Campbell was not free to leave when she went outside to smoke, and he was almost sure she was not handcuffed while outside.

In Cedillo's opinion, the Defendant did nothing wrong because a bondsman could arrest individuals out on bond and handcuff them. Cedillo testified there was nothing that prevented him from taking an individual out on bond to his office to fill out paperwork. Additionally, Cedillo testified that he never heard the Defendant threaten Campbell.

Captain Sean Eckhart testified that Campbell had been charged with being a principal to operation of a clandestine laboratory. Campbell reported that she was falsely arrested by the Defendant. Captain Eckhart's recap of the events confirmed that given by Cedillo. He further testified that Campbell was turned over to the Evangeline parish jail at some point.

Captain Eckhart testified that a bondsman could arrest an individual who was in breach of the terms of bail. Additionally, a bondsman could be armed, use handcuffs to make an arrest, and transport the individual. Captain Eckhart testified that if the arrest was unlawful, his opinion would change.

William Guidroz testified he had prior convictions for theft, forgery, and unauthorized use of a movable. Guidroz also testified that he had a child with Campbell and he filed litigation regarding custody of the child in March or June of 2011.

Guidroz testified that he paid the Defendant $600 to get Campbell out of jail, and he still owed him $2,400. After bonding arrangements were made, Guidroz

5

changed his mind, as his attorney informed him that, if Campbell was in jail, it would be easier for him to get his child. Guidroz then asked the Defendant to be released from the bond. Guidroz further testified that he told the Defendant that he wanted to be released from Campbell's bond unless she gave him custody of their child.

Guidroz testified that he signed a paper at the Defendant's office and the Defendant then went to pick Campbell up. Guidroz returned to the Defendant's office after the Defendant picked Campbell up. Guidroz testified the Defendant called him and asked if he still wanted to drop the bond. Guidroz was just down the road from the Defendant's office when he received the call, and he stopped by. While there, he spoke to Campbell in an office for approximately ten minutes. He could not recall if Campbell was handcuffed. Guidroz told Campbell if she would sign over custody of their child, he would pay the bondsman. If she did not sign over custody, he would drop her bond. Guidroz testified the Defendant was present during his discussion with Campbell. Guidroz then testified as follows: "When I was talking to her he threw it up like if you'd just uh . . . sign . . . sign over your rights you'd be able to go . . . go home." Guidroz did not recall the Defendant threatening Campbell. Guidroz testified that the Defendant told him to make up his mind if he wanted off the bond because, if he did, the Defendant had to bring Campbell to jail. Campbell did not sign over custody of the child.

Guidroz testified that he and Campbell were not yelling while in the office. Additionally, no one forced Campbell into a room with him, and no one closed the door and left her in the room with him. Guidroz could not recall if Campbell was handcuffed. Guidroz further testified that the Defendant allowed Campbell to use the telephone.

Chad Ardoin testified that he was engaged to Campbell on March 25, 2011. The Defendant went to his residence on that date. The Defendant told Ardoin he was there to pick up Campbell for revocation of her bond because Guidroz had asked to be removed from the bond. The Defendant was armed and followed Ardoin into his parents' house and into the back bedroom. Ardoin testified that he attempted to discuss the matter with his father and the following occurred:

> [W]e were pretty much shook down as to all we need is a little money, whatever you can get and just this or that, however much you have on hand, and make all this go away. We don't have to pick her up today. All we need is something to hold her on, just some cash.

Ardoin testified that he took the Defendant's statements to mean that, if he could come up with any amount of money, Campbell would not be arrested that day, and the bond would have stood. Ardoin testified he was not able to come up with any money, as he was out of work and his parents were on a fixed income. Additionally, he would not sell his truck. Ardoin further testified that he mentioned a property bond, and the Defendant told him it was too late in the day for that. Campbell was then handcuffed and put in a car. Ardoin subsequently drove to the courthouse to start paperwork on a property bond. Campbell was not at the courthouse when Ardoin arrived there. Campbell then called him and told him she was at the bonding office. Ardoin proceeded to that office. When Ardoin arrived at the bonding office, the Defendant was at the door of an office and told Ardoin that Campbell and Guidroz were working their matter out. Ardoin told the Defendant a property bond was in place.

Richard Ardoin, Chad's father, testified that Chad and Campbell lived together. Richard testified that Chad and Campbell entered his bedroom and told him her bond had been revoked. Later, the Defendant walked in the room, and he was wearing a

badge.  The Defendant told Richard that Campbell's bond had been revoked and wanted to know how much money they had or could come up with to "make this all go away."  Richard testified that he told the Defendant he could do a property bond, and the Defendant questioned him.  The Defendant then handcuffed Campbell and left with her.

Kimberly Campbell testified that she was a convicted felon, having previously been convicted of introducing contraband into a prison.  She also had charges pending for being a principal to a meth lab.  She was arrested for that charge on February 11, 2011.  She was also arrested for battery on March 21, 2011.  Further, she was on probation at the time of trial.

Campbell testified that she had a son with Guidroz, with whom she did not socialize, and she had full custody of the child.  Campbell testified she was living with Chad Ardoin on March 25, 2011, and the two were engaged.  There was no litigation pending between her and Guidroz at that time.  Campbell testified that the Defendant went to her house that day because Guidroz dropped her bond, and the Defendant told her he would have to arrest her.  The Defendant did not tell her she was being arrested because she had been arrested while on bond or had moved out of state.  Campbell testified the Defendant was armed at that time.  Campbell then stated the Ardoins said they would get a property bond, and the Defendant said there was not enough time for that.  Not long afterwards, the Defendant handcuffed her.  Campbell testified that she thought she was going to jail, but the Defendant took her to his bonding office.  Campbell testified that she did not choose to go with the Defendant.

Campbell testified that the Defendant called Guidroz and told him she was in custody.  She spoke to Guidroz on the phone and was handcuffed at that time.  Ten to fifteen minutes later, Guidroz showed up at the bonding office.  She and Guidroz

8

spoke in a back office. Guidroz told Campbell he would not drop her bond if she gave him custody of their child. She refused. The Defendant then told her if she would sign the papers she would not go to jail that day. She understood that, if she did not relinquish custody, her bond would be dropped, and she would go back to jail. Campbell testified that she had one handcuff on at all times, and the Defendant was armed at all times.

Campbell testified that she called her father from the bonding office seeking advice. She also testified she was in the office for twenty to thirty minutes. She further testified that she knew Chad and his mother were going to do a property bond. Subsequently, Chad showed up and had set up a property bond. Guidroz did not have any custody papers with him at the bonding office. During the twenty to thirty minutes, she saw paperwork on the Defendant's desk. However, she did not sign any papers.

Campbell testified that the Defendant brought her to jail, but the paperwork to drop the bond had not been signed by a judge; thus, the jail refused to take her. The only document the Defendant needed in order to surrender Campbell was the statement of surrender form, which was a preprinted form. The Defendant read the form as follows:

> It is understand by the security, the bail bond producer and on behalf of the Cedillo Bonding, LLC, wish to surrender recommend by the defendant by authorize James Bertrand as a licensed bond producer, licensed agent, security and any other Kimberly Campbell to the city or parish of Evangeline, State of Louisiana. The lawful reason for surrender is committed to Kimberly Campbell by the indemnitor, William Guidroz, in parenthesis mark, he printed it out, on the 25th day of March of 2011.

In brief to this court, the Defendant contends there was no legal basis upon which the jury could have found him guilty of false imprisonment. The Defendant asserts he had the legal authority, as a bondsman, to arrest Campbell and maintain her

in custody. In support of his claim, the Defendant cites *Taylor v. Taintor*, 83 U.S. 366, 371-72 (1872) (footnote omitted) (emphasis added), wherein the Supreme Court stated the following:

> When bail is given, the principal is regarded as delivered to the custody of his sureties. Their dominion is a continuance of the original imprisonment. Whenever they choose to do so, **they may seize him and deliver him up in their discharge; and if that cannot be done at once, they may imprison him until it can be done**. They may exercise their rights in person or by agent. They may pursue him into another State; may arrest him on the Sabbath; and, if necessary, may break and enter his house for that purpose. The seizure is not made by virtue of new process. None is needed. It is likened to the rearrest by the sheriff of an escaping prisoner.

The Defendant notes that in *Carlson v. Landon*, 342 U.S. 524, 547, 72 S.Ct. 525, 538 (1952) (footnote omitted), the Supreme Court stated: "When a prisoner is out on bond he is still under court control, though the bounds of his confinement are enlarged. His bondsmen are his jailers." The Defendant further notes that in *Cont'l Cas. Co. v. U.S.*, 314 U.S. 527, 531, 62 S.Ct. 393, 395 (1942), the Supreme Court stated:

> A bail charged with custody of a defendant, *Taylor v. Taintor*, 16 Wall. 366, 371, 21 L.Ed. 287, may exercise to the substantial benefit of criminal administration a high degree of care to prevent default, if he knows the later fortuitous apprehension of the principal will not relieve him of the forfeit.

The Defendant argues that Campbell was legally in his custody and gave her consent to the same when she signed the bond agreement with the surety company. Additionally, he had the legal authority to arrest Campbell when her indemnitor requested that he be released from her bond. The Defendant asserts that Campbell was brought to his office for twenty to thirty-five minutes so that he could complete the paperwork necessary to surrender Campbell, and this was legal. The Defendant further asserts that, although the State contends he brought Campbell to his office to

extort her child away from her, this contention was not accepted by the jury. The Defendant asks, if there was no extortion, how could his bringing Campbell to his office for twenty to thirty minutes be illegal?

The Defendant notes that La.Code Crim.P. art. 345 sets forth no time limitation; thus, there is no restriction on a surety being allowed to stop at his office to fill out paperwork or to allow Campbell to work out the details of another bond arrangement.

The State asserts the Defendant's claim that he had legal authority to confine Campbell while "he attempted to persuade her into relinquishing custody of her child" and that he had her consent are meritless. The State also asserts that a "shakedown went on for over thirty minutes with [Campbell] in tears." The State further asserts the paperwork the Defendant needed to complete at his office was a one-page preprinted form that required the name of the indemnitor; the name of the bondsman; the name of the defendant; the City, Parish, and State; the lawful reason for the surrender; and the date.

According to the State, the Defendant's argument suggests that, once bail is given, a bondsman has unrestricted control and authority over his principal/defendant; the State contends that the defendant's argument is incorrect. The State asserts that the language of both La.Code Crim.P. art. 345 and La.R.S. 22:1585 is permissive. The State further asserts the Defendant's interpretation that these provisions do not indicate there are restrictions on a bondsman and a time limit in which to surrender a defendant after seizing her is clearly wrong and would lead to an absurd result. The State asserts that, based on the Defendant's logic, he could seize Campbell, bring her to his office, and keep her there handcuffed indefinitely. The State asserts, based on *Taylor*, 83 U.S. 366, that only when immediate delivery is impossible may a bondsman imprison his defendant.

11

The State admits the Defendant had the authority to go to Campbell's home and seize her. It asserts the problem occurred when the Defendant failed to promptly deliver Campbell to her lawful jailers and went to his office for a shakedown of custody of her son. The State then notes that in *Lund v. Seneca County Sheriff's Dept.*, 230 F.3d 196 (6th Cir. 2000), the court said that a bondsman may not violate federal or state law.

The Defendant contends he did not violate any law by arresting Campbell. Further, he did not commit a crime by allowing her to attempt to work out her bail problems at his office or holding her in his office prior to bringing her to jail. The Defendant then sets forth the following:

> Does Appellant break the law by going to his office for only ten minutes to fill out forms? Does he break the law by allowing his principal to walk outside with the father of her child to discuss custody issues? Does the State contend Appellant had no right whatsoever to bring his principal to his office? Apparently, the State has a problem with each of these scenarios, but fails to point out any jurisprudence or legal guidance which draws the bright line that the State has obviously drawn. With this stance, a bondsman would not be able to stay in a hotel with his arrested principal three states away. Can a bondsman stop for thirty minutes to eat a fast-food meal while in route back to the parish of the prosecution while with a principal who is in his custody? If he does that, is he guilty of false imprisonment? If he had allowed his principal to make phone calls at her house before he took her off, all in an effort to attempt to acquire a new bond or a new indemnitor, would he be guilty of false imprisonment? Apparently, the State contends exactly that. The only problem with that position is that it is not countenanced by any law or jurisprudence that the State can point to. The State seemingly contends that a bondsman must turn over his charge to the sheriff "at once" or face the consequences of being prosecuted for falsely imprisoning that charge. The Supreme Court did not make that leap in its discussion in <u>Taylor</u>. To the contrary, the court made it quite clear that if a bondsman could not, for some reason, deliver his charge to the proper authorities, the bondsman could keep his charge imprisoned until it could be done. <u>Id</u>., p. 371. The court does not state or suggest that a bondsman breaks the law by not taking his charge directly to the sheriff, at once, immediately, forthwith, with no stopping. He is, after all, the jailer of his fugitive.

The Defendant further asserts that Campbell consented in advance to the situation she found herself in, and consent and legal authority were both present in this case.

Consent

The language found on the bonding documents signed by Campbell state that the bonding agent had the right to apprehend, arrest, and surrender her. These forms were not signed by the Defendant or anyone from Cedillo Bonding; however, Guidroz testified that bonding arrangements were made with the Defendant.

Although Campbell did not want to go with the Defendant when he arrested her, she consented to such, despite her testimony that she did not read the forms. Additionally, all testimony indicates that once at the Defendant's office, Campbell agreed to speak with Guidroz.

Legal Authority

The Defendant testified that the paperwork he needed in order to surrender Campbell had not been completed before he arrested her; thus, he stopped at his office after arresting her.

This Court has found no criminal cases in Louisiana addressing the duties of a bondsman to surrender an individual. "Although opinions of the Attorney General are advisory only and not binding, this court has recognized their persuasive authority, particularly where no cases on point can be found. *Roy v. Avoyelles Parish Sch. Bd.*, 552 So.2d 63 (La.App. 3 Cir. 1989)." *State in the Interest of J.M.*, 97-491, p. 4 (La.App. 3 Cir. 10/29/97), 702 So.2d 994, 997.

In La. Atty. Gen. Op. No. 81-253 (1981), the office of the Attorney General was asked whether a surety who did not bring the principal to the nearest jail could be arrested for kidnapping. The issues were addressed as follows:

By analogy to the situation of a peace officer failing to book his prisoner promptly at the nearest jail, one can arguably determine the penalties for such conduct on the part of bondsmen. The official comments to LSA-C.Cr.P. Article 228 indicates [sic] that a violation of the booking procedures by peace officers would constitute malfeasance in office under La. R.S. 14:134.[1] However, since bondsmen are not 'peace officers or public officials' per se, they could not be charged with malfeasance. They may however be subject to contempt proceedings or obstruction of court orders, depending upon the circumstances and seriousness of the misconduct complained of for failing to properly surrender their principals. Rf: La. Const. of 1974 Art. V. Section 2; LSA-C.Cr.P. Art. 17, 20 to 25 and R.S. 14:133.1 as amended.

Accordingly, given the surety's statutory power to arrest his principal for surrender purposes, an impropriety in the booking or surrender procedure would not constitute kidnapping. This conclusion is reached based upon the aforementioned analogy and upon the assumption that there is a surrender of some type. The situation of no surrender at all could, for sake of argument, cause one to consider such a flagrant violation as either kidnapping or false imprisonment, dependant [sic] upon the circumstances of each case.

*Id*. at pp. 1-2 (footnote added).

In La. Atty. Gen. Op. No. 01-70, p. 2 (2001), the Attorney General stated:

. . . La.C.Cr.P. art. 228 does impose a duty on any "peace officer" to promptly conduct the arrested defendant to the nearest jail or police station and cause him to be booked. While bondsmen have not been considered "peace officers" in Louisiana, it is our opinion that a bondsman does have a duty to promptly transport the arrested defendant to the nearest jail within the parish the arrest took place.

In La. Atty. Gen. Op. No. 81-1020 (1981), the Attorney General was asked if Article 228 required a peace officer, after making an arrest, to transport the arrestee to the nearest, geographically, jail for booking. The Attorney General's opinion discussed Article 228 as follows:

The purpose for requiring prompt booking of an arrestee is, as your request notes, to 'provide a valuable protection against secret arrests and improper police tactics.' La.C.Cr.P. Art. 228, Official Revision

---

[1] La.Code Crim.P. art. 228(A) provides: "It is the duty of every peace officer making an arrest, or having an arrested person in his custody, promptly to conduct the person arrested to the nearest jail or police station and cause him to be booked."

Comment (a). That purpose is served when the arrestee's name is entered on the public record of arrests maintained at the jail, and when he is given the opportunity to communicate with counsel, family and friends. This is recognized by the Official Revision Comments to the same article.

The word 'promptly' as used in the article has been interpreted by the courts of this state even before this version of the Code of Criminal Procedure was enacted. The comments, specifically [sic] paragraph C, have reference to a 1912 decision of the Louisiana Supreme Court which held that bringing certain arrested persons to the office of the district attorney before booking them did not violate the requirement that arrestees be booked 'immediately'. *State v. Canton*, 131 La.255, 59 So. 202 (1912).

More recently, the Louisiana Supreme Court has interpreted the word 'promptly' as used in article 228 to allow a four hour delay between arrest and booking, *State v. Johnson*, 255 La. 314, 230 So.2d 825 (1970), *Aff'd* 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972). In *State v. Hopper*, 251 La.77, 203 So.2d 222 (1967), the court found in applying this article's predecessor provisions that a delay of twelve hours between arrest and booking did not violate those statutes.

. . . .

First, the purpose of the statute is achieved as long as the arrested person is not secreted or held <u>in communicado</u>. Article 230 of the Code of Criminal Procedure specifically grants the arrestee the right to communicate with 'friends or with counsel'.

Second, a reasonable delay between arrest and booking has been allowed by the courts as within the spirit of the article. If delay for purposes of questioning, as in the *Johnson* and *Hopper* cases, is acceptable, so, too, should be a short delay for transportation.

Third, the arresting officer has a legitimate interest in obtaining certain information about the arrested subject for reporting purposes and for other administrative reasons. The convenience afforded the officer by compiling this information at this own department's district station does not impose any undue hardship on the arrested person.

. . . .

The purpose of article 228 is to prevent the secret arrest and detention of citizens by the police. This interest must be balanced against the legitimate concern of the law enforcement community to conduct proper questioning of arrestees and to acquire information regarding the identity of those in custody. It is our opinion that the transportation of

15

these arrestees to a district substation or to the parish prison does not violate the intent of the Code of Criminal Proecure [sic].

Therefore, it is the opinion of this office that persons taken into custody by sheriff's deputies within the geographic boundaries of the city of Kenner may be transported to the sheriff's district stations, the parish prison, or other appropriate office for processing and booking without having to first book them into the city jail.

*Id.* at pp. 1-2.

In *State v. Gaspard*, 95-1643 (La.App. 3 Cir. 5/8/96), 685 So.2d 151, *writ granted on other grounds and remanded*, 96-1390 (La. 6/28/96), 675 So.2d 1100, the defendant asserted the trial court erred in failing to suppress his confession, as police were required by La.Code Crim.P. art. 228 to immediately book him into jail after his arrest, police failed to honor the invocation of his right to remain silent, and he was led to believe that, if he gave a statement, he would avoid the death penalty. This court addressed the issue of the timeliness of booking, stating:

La.Code Crim.P. art. 228 requires that the police, having an arrested person in their custody, "promptly . . . conduct the person arrested to the nearest jail or police station and cause him to be booked." This provision does not mean the police must book the arrestee immediately. Instead, the police must be prompt in beginning the procedure to bring the arrestee before a magistrate in order that the arrestee may challenge his custody. In *State v. Hopper*, 251 La. 77, 203 So.2d 222 (1967), vacated and remanded for reconsideration in light of *Bruton* opinion, 392 U.S. 658, 88 S.Ct. 2281, 20 L.Ed.2d 1347 (1968), *conviction affirmed on remand*, 253 La. 439, 218 So.2d 551 (1969), *cert. denied* 396 U.S. 1012, 90 S.Ct. 545, 24 L.Ed.2d 504 (1970), the defendants were arrested but not booked in the parish jail until twelve hours later; the Louisiana Supreme Court found their confinement was legal at all times. *Id.*

*Id.* at 155 (alteration in original).

In *Landry v. A-Able Bonding, Inc.*, 75 F.3d 200, 206 (5th Cir. 1996) (footnotes omitted), a civil rights claim brought pursuant to 42 U.S.C. § 1983, the court stated:

Liability for false imprisonment is not foreclosed by a lawfully executed initial arrest, for false imprisonment may result from an unlawful detention following a lawful arrest.

16

Neither La.Code Crim.P. art. 345 nor La.R.S. 22:1585 state that a bondsman must surrender a defendant promptly; however, the Attorney General's Office has read the article to require prompt delivery. *See* La. Atty. Gen. Op. No. 01-70. Additionally, *Taylor*, 83 U.S. 366, states that a bondsman may seize a defendant and deliver him up, and, if that cannot be done at once, they may imprison him until it can be done.

Testimony indicates Campbell consented to be arrested by a bondsman and surrendered when she signed the bonding paperwork. Additional testimony indicates the Defendant did not have the paperwork necessary to surrender Campbell prepared at the time he arrested her. The Defendant then stopped at his office to prepare that paperwork. Guidroz arrived at the bonding office and wished to discuss the matter of child custody with Campbell. All testimony indicates that Campbell agreed to speak to Guidroz. Guidroz informed Campbell that he would remain on her bond if she relinquished custody of their child, and the Defendant told Campbell she could agree to a custody arrangement or be surrendered to jail.

When the proposition was presented by Guidroz, the matter of whether Campbell would be surrendered was unclear. There was no requirement that the defendant terminate the discussion between Campbell and Guidroz and immediately surrender Campbell to the authorities. Because Campbell refused to relinquish custody of her child and Guidroz wanted to be removed from her bond, the Defendant eventually surrendered Campbell. We find Defendant's acts do not constitute false imprisonment, as he did promptly attempt to surrender Campbell to the proper authorities. Additionally, a delay of thirty-five minutes before surrender would not be a violation of a requirement for prompt surrender based on an analogy to cases regarding prompt booking by the police. *See Gaspard*, 685 So.2d 151.

For the reasons set forth herein, we find the State failed to prove beyond a reasonable doubt that the Defendant falsely imprisoned Campbell; therefore, the Defendant's conviction should be reversed and his sentence set aside.

## DECREE

For the foregoing reasons, we reverse defendant's convictions and vacate sentence.  A judgment of acquittal is rendered.

**REVERSED; SENTENCE VACATED AND SET ASIDE; AND JUDGMENT OF AQUITTAL RENDERED.**